{¶ 1} Defendant-appellant, Wayne Gilliam, appeals from a Mahoning County Common Pleas Court judgment convicting him of two counts of aggravated murder, two counts of attempted aggravated murder, two counts of felonious assault, and improperly discharging a firearm into a habitation following a jury trial.
 {¶ 2} In the late evening hours of March 24, 2003, Jiyen Dent, Sr. and Latoya Butler were at home at 74 Rutledge Drive on Youngstown's east side with their three-month-old son, Jiyen, Jr. The couple had just moved from the south side of Youngstown to the east side. Dent was in the living room with his son, who was sitting in his baby swing. Dent heard gunfire outside and quickly grabbed his son and ran into the hallway. Unfortunately, the infant had already been shot. He died of a gunshot wound to the head.
 {¶ 3} Earlier that evening, a party was in progress nearby on Duncan Lane at the home of Gail Miller. Appellant was in attendance as was John Drummond. At the party, there was some discussion and argument about south siders moving in on east side territory. Both appellant and Drummond came to and left the party a few times. At one point, they left together in appellant's car. When they left the party, Drummond had an AK-47 assault rifle with him.
 {¶ 4} Appellant drove Drummond to Drummond's sister's house on Rutledge. He backed his car into the driveway and turned off his lights. Drummond exited the car with his AK-47. Gunshots were fired. Drummond got back in appellant's car with his weapon and appellant took off down the street with his lights off.
 {¶ 5} Appellant then parked his car at his cousin's house nearby, told Drummond to get out, and walked to 74 Rutledge. Appellant claimed that he did not see Drummond fire the shots, but that he thought to himself that he knew what had happened.
 {¶ 6} A Mahoning County grand jury indicted appellant on two counts of aggravated murder, first degree felonies, one in violation of R.C. 2903.01(A) and one in violation of R.C.2903.01(C); two counts of attempted aggravated murder, first degree felonies in violation of R.C. 2923.02(A) and R.C.2903.01(A); two counts of felonious assault, second degree felonies in violation of R.C. 2903.11(A)(2); and one count of improperly discharging a firearm at or into a habitation, a second degree felony in violation of R.C. 2923.161(A)(1). All counts contained firearm specifications under R.C. 2941.145(A).
 {¶ 7} Appellant proceeded to a jury trial. The jury found him guilty on all charges and specifications. Subsequently, the trial court sentenced appellant as follows: 20 years to life with three years on the firearm specification on count one; count two merged with count one; ten years on count three; ten years on count four; count five merged with count three; count six merged with count four; eight years on count seven. Additionally, the court found that all of the firearm specifications merged together except for the specification with count seven, for which it sentenced appellant to an additional three years. Finally, the court ordered that appellant was to serve his sentences consecutively for a total of 54 years to life.
 {¶ 8} Appellant filed a timely notice of appeal on September 22, 2003.
 {¶ 9} Appellant raises four assignments of error. We will address them out of order for ease of discussion. Appellant's second and third assignments of error share a common basis in law and fact. Thus, we will address them together. They state, respectively:
 {¶ 10} "The state of ohio failed to introduce sufficient evidence to prove beyond a reasonable doubt that Mr. Gilliam purposely or knowingly aided and abetted the principal in committing any criminal act thereby violating of [sic.] Mr. Gilliam's due process rights under the Fourteenth Amendment of the Constitution of the United States."
 {¶ 11} "The jury verdict was against the manifest weight of the evidence in violation of article iv § 3(b)(3) of the Constitution of the State of Ohio. THE GREATER WEIGHT OF THE EVIDENCE demonstrated that Mr. Gilliam did not purposely or knowingly aid and abet another in committing any criminal act."
 {¶ 12} Appellant contends his convictions were against both the sufficiency and the weight of the evidence. He contends that plaintiff-appellee, the State of Ohio, failed to present any evidence that he shared in Drummond's criminal intent or had any knowledge of what Drummond was planning to do. Appellant asserts that his mere presence at the crime scene was insufficient to prove that he aided and abetted Drummond.
 {¶ 13} Appellant also argues that the witnesses who were at the party or in the neighborhood were unreliable. He argues that the witnesses' testimony was conflicting. Specifically, he points to the witnesses who were at the party testifying as to when appellant and Drummond came and left. He also claims that these witnesses' testimony was unreliable because they admitted to drinking, smoking marijuana, or taking Valium on the night in question. And appellant alleges that James Rozenblat's testimony was self-serving since he may have been a suspect at one point.
 {¶ 14} Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict. State v. Smith (1997),80 Ohio St.3d 89, 113, 684 N.E.2d 668. In essence, sufficiency is a test of adequacy. State v. Thompkins (1997), 78 Ohio St.3d 380, 386,678 N.E.2d 541. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Id. In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.Smith, 80 Ohio St.3d at 113, 684 N.E.2d 668.
 {¶ 15} Alternatively, in determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins,78 Ohio St.3d at 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390, 678 N.E.2d 541.
 {¶ 16} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 17} For killing Jiyen, Jr., the jury convicted appellant of aggravated murder in violation of R.C. 2903.01(A), which provides in relevant part, "[n]o person shall purposely, and with prior calculation and design, cause the death of another" and aggravated murder in violation of R.C. 2903.01(C), which provides, "[n]o person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense."
 {¶ 18} For attempting to kill Dent and Butler, the jury convicted appellant of two counts of attempted aggravated murder in violation of R.C. 2903.01(A) and R.C. 2923.02(A), which provides, "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."
 {¶ 19} For shooting at Dent and Butler, the jury convicted appellant of two counts of felonious assault in violation of R.C.2903.11(A)(2), which provides in relevant part, "[n]o person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 20} And for shooting into the home, the jury convicted appellant of improperly discharging a firearm at or into a habitation in violation of R.C. 2923.161(A)(1), which provides in relevant part, "[n]o person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."
 {¶ 21} For all of the counts, the jury found appellant guilty by complicity under R.C. 2923.03(A)(2), which provides in relevant part, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." A charge of complicity may be stated in terms of the complicity statute or in terms of the principal offense. R.C. 2923.03(F). Although a defendant may be charged in an indictment as a principal, the court may instruct the jury on complicity where the evidence at trial reasonably supports a finding that the defendant was an aider or abettor. State v. Gonzales, 151 Ohio App.3d 160,783 N.E.2d 903, 2002-Ohio-4937, at ¶ 51.
 {¶ 22} We must examine the evidence adduced at trial to determine whether it supports the jury's verdicts. The witnesses can be divided into three groups: neighbors, party goers, and investigators. Each group will be examined in order.
 {¶ 23} Dent testified that he, Butler, and Jiyen, Jr. had just moved from the south side of Youngstown to the east side. (Tr. 640). Dent testified that on the night in question he was at home at 74 Rutledge Drive sitting in the living room with Jiyen, Jr. who was sitting in his baby swing. (Tr. 645). He heard gunshots and saw pieces of his wall fall off. (Tr. 645). Dent then grabbed his son and ran to the hallway, but Jiyen, Jr. had already been shot. (Tr. 646-47). Dent also saw bullets flying through his house. (Tr. 646).
 {¶ 24} Several people from the east side neighborhood testified regarding what they saw that night.
 {¶ 25} Wanda and William Greer live on Duncan Lane, two houses away from Gail Miller's house where the party took place that day. Wanda noticed the party going on. William observed appellant and Drummond at the party. (Tr. 681-82). Wanda observed Drummond at the party. (Tr. 668). She also observed a burgundy car riding up and down Duncan Lane. (Tr. 672). William saw appellant driving his burgundy car in the area that night. (Tr. 682). He also noticed appellant and Drummond pull up in appellant's car together at one point and watched Drummond exit the car with a big gun. (Tr. 682, 684). William saw appellant and Drummond leave together and drive toward Rutledge. (Tr. 685).
 {¶ 26} Wanda also testified that at one point she heard gun shots and called the police. (Tr. 668). She learned that Dean Thomas and his wife Tawanda had gotten into an argument and she fired shots into the air. (Tr. 668-69). About 30 minutes later, Wanda heard "major shooting." (Tr. 669).
 {¶ 27} Rebecca Perez lives at 58 Rutledge, which is approximately two blocks from where the shooting occurred. Drummond's sister lives on the other side of the street and in between where Perez lives and where the shooting occurred. Perez testified that on the night in question, she heard gunshots coming from up the street. (Tr. 695). She then saw a dark car with its headlights off come out of a driveway on the opposite side of the street and drive past her house towards McCartney Road. (Tr. 697-98). When she was shown pictures of appellant's burgundy Monte Carlo, Perez testified that it looked like the car she saw that night. (Tr. 698-99, 716).
 {¶ 28} Diane Patrick lives at 76 Rutledge Drive, next door to 74 Rutledge. On the night in question, Patrick heard gunshots. (Tr. 722). She looked out her window towards Duncan and noticed a dark car coming out of a driveway with its lights off. (Tr. 722). She then heard more shots that sounded like they were right at her window. (Tr. 722). Patrick testified that five shots struck her house. (Tr. 724).
 {¶ 29} On the night in question, Dean Thomas was living with his mother, Gail Miller, at 63 Duncan Lane. Sometime that afternoon, Thomas and his wife were sitting outside and people began gathering at the house. (Tr. 950). Thomas admitted to drinking beer and smoking marijuana that night. (Tr. 965). Thomas testified that at one point, his wife became upset and fired a gun into the air. (Tr. 952). Among the people that showed up were Drummond, who arrived in his Cadillac, and appellant, who arrived in his burgundy Monte Carlo. (Tr. 950-53). When appellant came to the gathering, he approached Drummond and whispered something to him. (Tr. 954). Appellant and Drummond then left in separate cars. (Tr. 954). Drummond returned with a big gun that looked like an assault rifle. (Tr. 955-57). Appellant returned five minutes later. (Tr. 955). Drummond then got in appellant's car, with his gun, and the two left together, going down Duncan and turning onto Rutledge. (Tr. 955-56, 958). Drummond left his car at Thomas's house. (Tr. 960). Approximately ten minutes later, Thomas heard loud shooting nearby. (Tr. 959-60).
 {¶ 30} James Rozenblat was also at the party that night. He admitted to drinking beer and taking Valium. (Tr. 981). Rozenblat saw appellant and Drummond at the party. (Tr. 981-82). He testified that Drummond had an assault rifle. (Tr. 982). Rozenblat stated that he overheard a discussion about south siders taking over the area. (Tr. 983). Both appellant and Drummond were involved in the discussion. (Tr. 983). Rozenblat also saw appellant and Drummond leave the party together in appellant's Monte Carlo. (Tr. 983-84). Drummond had his rifle with him when he got into appellant's car. (Tr. 984). Approximately five to ten minutes after appellant and Drummond left the party, Rozenblat heard shooting. (Tr. 985).
 {¶ 31} Patrolman David Wilson helped with the investigation in this matter. He found ten casings from an assault rifle on the street in front of 67 or 65 Rutledge. (Tr. 743). He also testified that he was with Sergeant Lambert when he found some 9mm casings in the vicinity of the corner of Rutledge and Duncan. (Tr. 746).
 {¶ 32} Ed Carlini, a special agent with BCI, testified about the numerous bullets that entered the homes and their angles. He was able to determine that most of the bullets that struck 74 Rutledge were fired from the southwest side of the home in a northeastern direction. (Tr. 813). This is the same direction where Drummond's sister's house is located.
 {¶ 33} Officer Anthony Marzullo responded to the crime scene to collect and preserve any evidence. He noticed numerous bullet holes in the house and recovered several slugs from inside the house.
 {¶ 34} Andrew Chappell, a forensic scientist with BCI, testified about slugs recovered from the crime scene. He testified that all of the 7.62 x 39mm casings, which are the type used in AK-47s, that were recovered passed through the same firearm. (Tr. 927). He also determined that all of the 9mm casings that were recovered were fired from the same gun. (Tr. 930).
 {¶ 35} Detective Sergeant Ronald Rodway testified that an AK-47 was seized from Drummond's house. (Tr. 1009). He also testified that it was loaded with 7.62 x.39mm bullets, which were the same type of shell casings that were found on Rutledge after the shooting. (Tr. 1009-1010). Additionally, Detective Rodway testified that he was present during two police interviews with appellant. Appellant's videotaped interviews were then played for the jury.
 {¶ 36} In his first interview, appellant admitted attending the party and talking with Drummond. Appellant also admitted that he drives a burgundy Monte Carlo and that he drove around the Duncan/Rutledge area that night. However, he denied that Drummond ever got in his car with him. He also denied that he ever pulled into Drummond's sister's driveway that night. He claimed that when he was driving down Rutledge, he heard gunshots but did not see anyone. When appellant was asked if he knew where the person who lived in the house that got shot up had lived previously, he responded "no." But he continued his answer stating that earlier that day Juannie, another person at the party, was talking about "some south side cats were out here," trying to "take over out here [on the east side]." He also stated that Juannie was mad about the south siders moving into an east side neighborhood. And he acknowledged a problem that people he associated with had with south siders because of a death that had occurred on the south side.
 {¶ 37} After his first interview, the police learned some new information about the shooting. Appellant was made aware of this. He then chose to give a second interview. (Tr. 1004-1005).
 {¶ 38} Appellant changed his story in his second interview. Again he stated that he went to the party on Duncan. He stated that among the people there, he saw Drummond, Juannie, and Rozenblat. He was involved in a conversation with them where there was talk about "some south side cat was trying to take over out there." However, he stated that he did not know who they were talking about. He stated that names were not mentioned, just that they were south side guys. Appellant stated that mainly it was Juannie doing the talking and that the group was arguing about it.
 {¶ 39} Next, appellant stated that he and Drummond got into his burgundy Monte Carlo. Drummond had a big gun with him. The two drove around a bit and went back to the party on Duncan. Juannie was still there talking about "the same shit." They only stayed a short while before Drummond asked appellant to drop him off at his sister's house. Appellant stated that he drove Drummond to his sister's house on Rutledge. Appellant backed into Drummond's sister's driveway and "cut the lights off." Drummond got out of the car with his gun.
 {¶ 40} Subsequently, appellant stated that he did not see Drummond go into the house. He remained in the car and started "freakin." He then heard numerous gunshots. Drummond ran back to appellant's car with his gun in his hand and told appellant to go. So appellant pulled out of the driveway and drove down the street. At some point he put his lights back on. Appellant stated that as he drove away, he heard more gunfire. He thought the other shots were from Juannie, because Juannie was "the main one talking shit." Appellant stated that although Drummond never told him what he did, "in [appellant's] mind [he] know what the hell went on."
 {¶ 41} Appellant went to his cousin's house nearby and told Drummond to get out of the car. Appellant went into his cousin's house and Drummond walked away with his gun. After getting a shirt from his cousin, appellant walked over to where the shooting occurred. Drummond met appellant there. Drummond no longer had a gun with him.
 {¶ 42} Appellant contends that all of this evidence did not establish that he aided or abetted Drummond in the shooting. He maintains that it only revealed that he was at the crime scene.
 {¶ 43} However, several factors, when considered together, support the fact that appellant did aid and abet Drummond in the shooting. The evidence established appellant and Drummond arrived at the party separately, each in their own car. Both were involved in a group discussion about south siders taking over on the east side. The victims had just moved to the east side from the south side. Appellant approached Drummond and whispered something in his ear. The two then left, again in separate cars. They arrived back at the party within a few minutes of each other. When Drummond returned, he had an assault rifle with him. Appellant and Drummond then left the party together in appellant's car. Drummond brought his assault rifle with him. Appellant drove Drummond to his sister's house on Rutledge and pulled into her driveway, which was a few houses away from Dent and Butler's house. When he pulled into the driveway, appellant backed in and turned off his lights. Drummond exited appellant's car. Appellant heard shooting. Drummond then ran back to appellant's car, with his weapon, and told appellant to go. Appellant pulled out of the driveway and drove Drummond away from the scene with his lights off.
 {¶ 44} Additionally, at oral argument appellant argued that the facts of this case were almost identical to the facts inState v. Ratkovich, 7th Dist. No. 02-JE-16, 2003-Ohio-7286. InRatkovich, a mother was convicted of complicity to commit theft. We reversed her conviction finding that she did not support, assist, encourage, cooperate with, advise, or incite her son in the commission of the theft. The facts revealed that Ratkovich drove her son to Circuit City and waited in the parking lot while he went into the store. While in the store, her son stole two Sony Play Station game systems. He then ran out of the store and jumped into Ratkovich's car. He told his mother that he had just stolen something and yelled at her to go. Ratkovich drove her son away from the store even though a manager from the store hollered for her to stop.
 {¶ 45} In reversing the conviction, we reasoned that the evidence did not suggest that appellant knew what her son was planning to do when she dropped him off at Circuit City. This distinguishes Ratkovich from the case at bar. In this case, there was evidence that appellant planned with Drummond before
driving him to Rutledge. For instance, after appellant whispered something to Drummond, Drummond left the party, and returned with an assault rifle. And when appellant dropped Drummond off in his sister's driveway, he saw Drummond take his assault rifle with him. Additionally, before the shooting, appellant and Drummond were involved in a conversation about south siders taking over on the east side. Another thing that distinguishes this case fromRatkovich, is that in that case Ratkovich's son testified that he did not tell his mother about his plan to steal from Circuit City. This further established that she had no idea what he planned to do when she dropped him off at the store, unlike the case at hand where appellant knew that Drummond had an AK-47 with him when he exited the car, which tended to indicate that appellant knew Drummond was about to commit a crime.
 {¶ 46} To support appellant's conviction for aiding and abetting, the evidence had to demonstrate that appellant supported, assisted, encouraged, cooperated with, advised, or incited Drummond in the commission of the crime, and that appellant shared Drummond's criminal intent. State v. Johnson
(2001), 93 Ohio St.3d 240, at the syllabus, 754 N.E.2d 796. His intent could be inferred from the circumstances surrounding the crime. Id.
 {¶ 47} This evidence demonstrated that appellant was not merely present at the crime scene, but actively aided and abetted Drummond in the shooting. To "aid and abet" is "`[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" Id. at 243, quoting Black's Law Dictionary (7 Ed.Rev. 1999) 69. This can be inferred from the circumstances surrounding the crime. Participation in criminal intent may be inferred from one's presence, companionship, and conduct before and after the offense is committed. Id. at 245, citing State v.Pruett (1971), 28 Ohio App.2d 29, 34, 273 N.E.2d 884.
 {¶ 48} Appellant was with Drummond before, during, and after the shooting. He knew Drummond had an assault rifle with him. In fact, appellant whispered something to Drummond, Drummond left the party, and then returned with the assault rifle. Appellant also knew that Drummond and others at the party were not happy with the fact that south siders were taking over on the east side. And he was aware of some sort of feud that existed regarding someone who was killed on the south side. Appellant provided Drummond with a ride to the crime scene and then provided Drummond with his get-away ride.
 {¶ 49} Furthermore, considering the evidence and appellant's contention that he did not know what Drummond was going to do, brings several questions to mind. First, if appellant was just giving Drummond a ride to his sister's house, as he alleged, why would he wait in the driveway after Drummond exited his car? Second, why would Drummond ask appellant to drop him off at his sister's house when Drummond drove to the party and had his own car there? Third, why would appellant back into the driveway and turn off his lights unless he was trying to be inconspicuous and prepared for a quick getaway? Finally, after he heard the shots fired, why would appellant stay in the driveway instead of immediately leaving the area? These questions indicate that appellant knew Drummond's plan and helped him carry it out.
 {¶ 50} Thus, construing the evidence in the light most favorable to the prosecution, it was sufficient to prove that appellant aided and abetted Drummond in the shootings.
 {¶ 51} Appellant also argues that the witnesses who were at the party that night were unreliable in their testimony because they were drinking, smoking marijuana, or taking Valium.
 {¶ 52} Although an appellate court is permitted to independently weigh the credibility of the witnesses when determining whether a conviction is against the manifest weight of the evidence, we must give great deference to the fact finder's determination of witnesses' credibility. State v.Wright, 10th Dist. No. 03AP-470, 2004-Ohio-677, at ¶ 11. The policy underlying this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Id.
 {¶ 53} Here, the witnesses testified as to how much they had to drink, if they smoked marijuana, and if they took any pills on the night in question. Thus, the jury knew which witnesses may have been under the influence that night. The jury was able to take that into consideration when weighing those witnesses' testimony. We will not second guess the jury's determinations on these matters. Furthermore, while some of the witnesses may have been under the influence when they observed appellant and Drummond that night, their stories basically corroborated each other, which lends them credibility. Therefore, we cannot conclude that the jury lost its way in weighing the evidence.
 {¶ 54} Accordingly, appellant's second and third assignments of error are without merit.
 {¶ 55} Appellant's fourth assignment of error states:
 {¶ 56} "The trial court erred when it failed to properly instruct the jury on aiding and abetting under R.C. 2923.03(a)(2) as the trial court failed to adequately provide the necessary specific instructions to the jury to allow it to properly determine whether appellant gilliam was an aider and abettor. this error denied appellant gilliam a fair trial under theFourteenth Amendment to the United States Constitution."
 {¶ 57} Here appellant argues that the trial court's jury instructions on aiding and abetting were inadequate. He contends that the court was required to, and failed to, instruct the jury that (1) it needed to find that appellant and Drummond made a prior agreement to commit the crimes in order to find him guilty and (2) appellant's mere presence at the crime scene did not establish aiding and abetting.
 {¶ 58} When reviewing a trial court's jury instructions, an appellate court must consider whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case. Statev. DeMastry, 155 Ohio App.3d 110, 799 N.E.2d 229,2003-Ohio-5588, at ¶ 72; State v. Wolons (1989),44 Ohio St.3d 64, 68, 541 N.E.2d 443. Abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Clark
(1994), 71 Ohio St.3d 466, 470, 644 N.E.2d 331. Furthermore, we must consider the jury instructions as a whole and not view a single portion in isolation. State v. Jalowiec (2001),91 Ohio St.3d 220, 231, 744 N.E.2d 163. A trial court need not give requested jury instructions if the instructions it does give are adequate. State v. Cook (1992), 65 Ohio St.3d 516, 525,605 N.E.2d 70.
 {¶ 59} Here, the trial court's instructions were adequate. The trial court gave lengthy instructions, including numerous references to and explanations of aiding and abetting. The court began by noting that appellant was charged as an aider and abettor on all counts. (Tr. 1216). It then instructed the jury on the aggravated murder charge, in relevant part, as follows:
 {¶ 60} "The defendant is charged with complicity in the commission of the offense of aggravated murder. Before you can find the defendant guilty, you must find beyond a reasonable doubt that * * * [he] purposely aided or abetted another in committing the offense of aggravated murder * * *.
 {¶ 61} "A person acts purposely when he aids or abets another when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to aid or abet another in causing the death of a person.
 {¶ 62} "Purpose is a decision of the mind to do an act with the conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself, unless he expresses it to others and indicates it by his conduct.
 {¶ 63} "* * *
 {¶ 64} "If you find that the defendant, Wayne Gilliam, did have the purpose to aid and abet the principal, John Drummond, in causing the death of a particular person, and that the shot accidentally caused the death of another person, then the defendant, Wayne Gilliam, would be just as guilty as if the shot had caused the death of the person intended.
 {¶ 65} "* * *
 {¶ 66} "Aided or abetted means to help, assist, strengthen, encourage, counsel or incite.
 {¶ 67} "* * *
 {¶ 68} "To support a conviction for complicity by aiding or abetting, the evidence must show that the defendant shared the criminal intent of the principal.
 {¶ 69} "Participation in criminal intent may be inferred from presence, companionship, and conduct before and after the offense is committed." (Tr. 1216-1221).
 {¶ 70} The court gave similar instructions regarding the other six counts and made sure to instruct the jury that the aiding and abetting instruction applied to all counts and specifications.
 {¶ 71} The court was not required to instruct the jury that it had to find that appellant and Drummond made a prior agreement to commit the crimes in order to find appellant guilty. Aiding and abetting does not require evidence that the defendant specifically entered into a plan with the principal to commit a crime. As noted above, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.Johnson, 93 Ohio St.3d at the syllabus. Aiding and abetting may be demonstrated by direct or circumstantial evidence. State v.Brewster, 157 Ohio App.3d 342, 2004-Ohio-2722 at ¶ 45. In this case, the circumstances before, during, and after the shooting demonstrated that appellant supported, assisted, and cooperated with Drummond in the commission of the crimes. Appellee was not required to prove that appellant and Drummond entered into a calculated plan. The court correctly instructed the jury on what it meant to aid and abet someone. This instruction was adequate.
 {¶ 72} Appellant also argues that the court should have instructed the jury that his mere presence at the crime scene did not establish aiding and abetting. While appellant's request was a correct statement of the law, we cannot conclude that the court abused its discretion in deciding not to give it. When a court adequately instructs the jury on the requirements of aiding and abetting, it need not specifically instruct that "mere presence" alone is insufficient to support a complicity conviction. SeeState v. Howard (Aug. 3, 2000), 10th Dist. No. 99AP-949; Statev. Luke (Feb. 1, 1999), 3d Dist. No. 4-98-13. The court instructed the jury that in order to find appellant guilty, it had to find that he acted purposely. It then instructed them that to act purposely is to act intentionally and not accidentally. It further instructed the jury that in order to convict appellant, they had to find that he had a specific intention to aid or abet another in committing the crimes. According to these instructions, if appellant was merely present at the scene of the crime, the jury could not convict him because he would not have acted purposely with the intent to aid and abet Drummond. Consequently, the court's instructions were adequate.
 {¶ 73} Therefore, the trial court did not abuse its discretion in failing to give appellant's requested instructions. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 74} Appellant's first assignment of error states:
 {¶ 75} "The trial court erred when it admitted evidence of a prior other act under ohio rule of evidence 404(b) in violation of Mr. Gilliam's right to due process and to a fair trial under the Fourteenth Amendment of the United States Constitution and under Art. 1, § 10 of the Constitution of the State of Ohio."
 {¶ 76} Appellant argues that the trial court erred in admitting testimony regarding a shooting he was involved with in 2001. Appellant made a statement to police regarding that shooting. He stated that he drove three others to an apartment to burglarize it. While appellant waited in the car, his two cousins went inside the apartment. Appellant then heard gunshots. He waited for his cousins to return and then drove them away from the scene. Officer Steven Woodberry testified as such.
 {¶ 77} Appellant filed a motion in limine to prevent appellee from using this evidence at trial. Appellee argued that the testimony was admissible because (1) it demonstrated the absence of mistake or accident and (2) it showed appellant's scheme, plan, or system in committing the crimes at issue. The trial court overruled appellant's motion. Appellant objected again when appellee solicited the testimony from Officer Woodberry.
 {¶ 78} The trial court's admission of the alleged prejudicial evidence was based on Evid.R. 404(B), which provides:
 {¶ 79} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 80} Appellant contends that the evidence did not meet either exception that appellee put forth.
 {¶ 81} First, appellant argues that the evidence could not be admitted to show absence of mistake or accident. He asserts that in order for evidence to be admissible under this exception, appellee would have had to demonstrate that there was a connection in his mind between the offense in question and the other acts of a similar nature. State v. Burson (1974),38 Ohio St.2d 157, 159, 311 N.E.2d 526. He contends that the other acts must "have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question." Id.
 {¶ 82} Appellant asserts this case is identical to Burson,
where the defendant was charged with purposely killing someone while committing a robbery. The trial court permitted a witness to testify that four years prior, the defendant had severely beat him and stole his money. The Ohio Supreme Court reversed, finding that the admission of such evidence amounted to prejudicial error. It found that the evidence was not indicative of the defendant's scheme or plan, his identity, or his absence of mistake or accident, but only showed that the defendant was an intemperate and violent individual.
 {¶ 83} Second, appellant argues that the evidence could not be admitted to show a scheme, plan, or system because it was not related to the crimes charged. He asserts that in order to be admissible under this exception, the evidence would have needed to form part of the immediate background of the crime charged, and been "inextricably related" to the act alleged in the indictment. State v. Thompson (1981), 66 Ohio St.2d 496, 498,422 N.E.2d 855. Since the evidence at issue here was unrelated to the crimes charged, appellant argues, it was inadmissible.
 {¶ 84} The admission or exclusion of evidence is within the trial court's discretion. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Thus, we will not reverse the trial court's decision absent an abuse of discretion. Furthermore, even if the trial court abused its discretion, we will not reverse the judgment unless the defendant has suffered material prejudice.State v. Lowe (1994), 69 Ohio St.3d 527, 532, 634 N.E.2d 616.
 {¶ 85} The evidence of the 2001 robbery was independent and unrelated to the offenses for which appellant was on trial. "Evidence of other crimes, wrongs or bad acts independent or unrelated to the offense for which a defendant is on trial is generally inadmissible to show criminal propensity." State v.Wickline (1990), 50 Ohio St.3d 114, 120, 552 N.E.2d 913. The evidence of the 2001 robbery does not demonstrate that appellant acted in accordance with some common scheme or plan. It was completely unrelated to the offenses in question and occurred two years previously.
 {¶ 86} Appellee points this court to our decision in Statev. Jones (June 26, 1998), 7th Dist. No. 95-CA-88. In Jones,
the defendant was charged with murdering his wife. The State, over the defendant's objection, introduced testimony from the defendant's ex-wife. She testified that ten years prior, when she threatened to leave him, the defendant held her and their minor child hostage at gunpoint. She also stated that six months later, the defendant absconded with their minor child. In the case at trial, the defendant was accused of arguing with his wife, shooting her, and absconding with their children. The defendant had given a statement to the police that the shooting occurred when he and his wife fought over the rifle. This court noted:
 {¶ 87} "`While other acts evidence aimed at showing an idiosyncratic pattern of conduct should not be so remote from the offense charged as to render them nonprobative, it is not necessary that they be near the offense at issue in both place and time, as the probative value of such conduct lies in its peculiar character rather than its proximity to the event at issue.'" Id., quoting State v. DePina (1984),21 Ohio App.3d 91, paragraph two of the syllabus, 486 N.E.2d 1155.
 {¶ 88} Appellee contends that Jones, held that ten years is not too remote in time for a prior bad act because of the probative nature of the prior act. While that may be so, the reason this court found that the ex-wife's prior bad acts testimony was admissible in Jones was because it refuted the defendant's position that his wife's death was an accident. In this case, however, appellant never alleged an accident. Thus, the Jones reasoning does not apply here.
 {¶ 89} Finally, appellant's identity was not at issue in this case. Appellant admitted driving Drummond to Rutledge on the night in question. Additionally, several witnesses identified appellant and his car. Thus, appellee did not have to use prior bad act evidence to prove appellant's identity.
 {¶ 90} Thus, the court erred in allowing appellee to introduce the prior bad act evidence. However, the trial court specifically instructed the jury:
 {¶ 91} "During the course of the trial, evidence was received about the commission of acts other than the offenses with which the defendant is charged in this trial. The evidence was received only for a limited purpose. Excuse me. That evidence was received only for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity or accordance with character. If you find the evidence of the other facts is true and that the defendant committed it, you may consider that evidence only for the purpose of deciding whether it proves the absence of mistake or the defendant's intent or purpose to commit the offense charged in this trial." (Tr. 1231-32).
 {¶ 92} By giving the jury this instruction, the trial court took the proper measure to ensure that the jury did not consider the evidence of the 2001 robbery for the purpose of proving appellant's character or to show that he acted in conformity with that character. A jury is presumed to follow the instructions given by a trial judge, including curative instructions. Statev. Loza (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082. There is no evidence that indicates that the jury disregarded the court's instructions.
 {¶ 93} Furthermore, as discussed in appellant's second and third assignments of error, disregarding the prior bad act evidence, the remaining evidence supports appellant's convictions. Thus, although the court erred in admitting the evidence of appellant's prior bad act, its admission does not require a reversal as it did not prejudice the outcome of the case. Therefore, appellant's first assignment of error is without merit.
 {¶ 94} For the reasons stated above, the trial court's decision is hereby affirmed.
Vukovich, J., concurs. See concurring opinion.
DeGenaro, J., concurs.