THE STATE OF OHIO, APPELLEE, *v.* DRUMMOND, APPELLANT.

[Cite as *State v. Drummond,* 111 Ohio St.3d 14, 2006-Ohio-5084.]

(No. 2004–0586—Submitted March 28, 2006—Decided October 18, 2006.)

———————

LANZINGER, J.

{¶ 1} On the evening of March 24, 2003, during a drive-by shooting, assault-rifle bullets and 9 mm shots were fired into the home of Jiyen Dent in Youngstown, Ohio. One bullet killed three-month-old Jiyen Dent Jr., who was in the living room. John E. Drummond Jr., was indicted, tried, and convicted by a jury of the aggravated murder of the infant Jiyen.

{¶ 2} Drummond was charged with two counts of aggravated murder. Count One charged Drummond with the aggravated murder of Jiyen with prior calculation and design. Count Two charged Drummond with aggravated murder for purposely causing the death of a child under 13 years of age.

{¶ 3} Both counts included death-penalty specifications for a course of conduct involving the purposeful killing of, or attempt to kill, two or more persons, R.C.

2929.04(A)(5), and murder of a child under 13 years of age, R.C. 2929.04(A)(9). Drummond was also charged with attempted murder in Counts Three and Four, felonious assault in Counts Five and Six, and improperly discharging a firearm in Count Seven. Each count included a firearm specification. Count Eight, having a weapon while under a disability, was severed from the other counts and later dismissed. Drummond's friend, Wayne Gilliam, was indicted, tried, and convicted in a separate case and was sentenced to 54 years to life in prison. The court of appeals affirmed the judgment of the trial court. *State v. Gilliam*, Mahoning App. No. 03–MA–176, 2005-Ohio-2791, 2005 WL 1324751.

{¶ 4} Drummond now appeals his convictions and sentence of death.

### State's Evidence at Trial

{¶ 5} The state presented several witnesses who testified at Drummond's trial that Drummond and Brett Schroeder were members of the Lincoln Knolls Crips gang and considered themselves "original gangsters," or "OGs." Schroeder died from gunshot wounds in May 1998 in a death ruled a homicide. The perpetrator was convicted and is serving time in prison.

{¶ 6} The Dent family, Jiyen Dent Sr., Latoya Butler, his girlfriend, and their son, Jiyen Dent Jr., had moved into a home at 74 Rutledge Drive in Youngstown around March 20, 1998. Dent did not know Drummond, Gilliam, or Schroeder.

{¶ 7} In the early evening of the shooting, a few days after Dent moved in, ten to 20 people gathered for a party outside the home of Gail Miller on Duncan Avenue in Youngstown to drink and listen to music. Sometime that evening, Drummond and Gilliam arrived.

{¶ 8} During the party, James "Cricket" Rozenblad overheard Drummond, Gilliam, and Andre Bryant talking about a "guy moving in in [their] neighborhood [who] could have had something to do with the death of Brett Schroeder." Yaraldean Thomas also saw Drummond and Gilliam whispering to one another and heard Drummond say "It's on" after they finished talking.

{¶ 9} Drummond left the party and returned a short time later with an assault rifle. He and Gilliam then got into Gilliam's burgundy Chevrolet Monte Carlo and drove down Duncan Lane toward Rutledge Drive. Approximately five to 15 minutes later, 11 shots were fired from an assault rifle into the Dent home. Within a few seconds, a 9 mm round was fired into the Dent home, and five 9 mm rounds were fired into the home of Diane Patrick, the Dents' next-door neighbor, who lived at 76 Rutledge Drive.

{¶ 10} At around 11:25 p.m. that evening, Dent was in the living room watching a movie, Butler was in the kitchen, and Jiyen was in a baby swing in the living room. While watching TV, Dent heard gunshots and saw "bullets start coming through the windows and the walls." He then picked up the baby and ran down

the hallway towards the bathroom. Dent fell in the hallway and noticed that Jiyen had been shot in the head. After making sure that his girlfriend was safe, Dent called 911.

{¶ 11} That same night, Rebecca Perez, who lived nearby on Rutledge Drive, heard two series of shots when taking her trash outside. She saw shots coming from the corner of Duncan Lane and Rutledge Drive and noticed "a shadow up the street." Shortly thereafter, Perez saw a maroon car pull out of the driveway next to 65 Rutledge Drive, where Drummond lived. The car then drove without any headlights on past the Perez home. Approximately half an hour to 45 minutes later, Perez noticed that the maroon car had returned to the driveway next to Drummond's home. At trial, Perez identified Gilliam's Monte Carlo as the car she had seen that night.

{¶ 12} Leonard Schroeder, the brother of Brett Schroeder, who had been killed nearly five years before, lived near Rutledge Drive. On the evening of March 24, Leonard heard a series of gunshots. Shortly afterwards, Drummond and Gilliam arrived at Leonard's home in Gilliam's car. Leonard asked Drummond about the shots, and Drummond said that he "didn't know who it is. It was probably Cricket and Wany." Gilliam said only that "some fools are shooting over there."

{¶ 13} Arriving police and paramedics found that Jiyen had been killed. Investigators secured the scene and began their investigation. Officer Kerry Wigley walked down Rutledge Drive, looking for shell casings, and noticed two men in the dark, leaning against a car parked in a driveway. Wigley intercepted the two men, asked for their identification, and identified them as Drummond and Gilliam.

{¶ 14} During the investigation, Patrolman David Wilson found ten cartridge casings from assault-rifle ammunition lying between two houses that were across the street and several houses away from the Dent home on Rutledge Drive. The police also found six 9 mm shell casings at the corner of Rutledge Drive and Duncan Lane.

{¶ 15} Investigators found that someone had fired 11 bullets from an assault rifle into the Dent home. Three bullets had hit the house near the front door, three others had hit elsewhere on the front of the house, and five bullets had hit the west side of the house where the bedrooms were located. A 9 mm bullet hole was also found on the east side of the Dent home.

{¶ 16} Ed Carlini, an Ohio Bureau of Criminal Investigation ("BCI") agent, examined the trajectory of the bullets entering the Dent home. Carlini determined that the shots had originated from a location on Rutledge Drive where ten shell casings were found. He also determined that the 9 mm shot that hit the Dent home originated from east of the house.

{¶ 17} Carlini and Officer Anthony Marzullo, a crime lab technician, examined bullet holes inside the Dent home. There were five bullet holes inside the southwest bedroom and three bullet holes inside the northwest bedroom. One bullet entered the living room, fragmented, and was found in the far living-room wall. A 9 mm slug was found in the kitchen wall. Marzullo recovered other bullet fragments and copper-jacketed slugs inside the house. He also recovered bullet fragments and bits of blue plastic that had been removed from the victim during the autopsy.

{¶ 18} Andrew Chappell, a ballistics expert, compared the ten 7.62 × 39 mm assault-rifle cartridge casings and concluded that they could have been fired from the same firearm. He stated that an assault rifle such as an AK–47 semiautomatic rifle would have fired this ammunition. Chappell examined the six 9 mm cartridge casings and concluded that each of the casings had been fired from the same firearm. Chappell also examined the slugs and bullet fragments obtained from the Dent home and identified one 9 mm Luger bullet, a 7.62 mm bullet, a 7.62 mm bullet jacket fragment, a piece of metal, and a couple of lead fragments. He determined that the 7.62 bullet and the 7.62 bullet jacket fragment were fired from the same weapon, but he was unable to make any comparisons with the lead fragment and the blue plastic recovered from the victim at the autopsy.

{¶ 19} As the murder investigation progressed, Drummond and Gilliam were identified as suspects. On March 27, 2003, the police searched Drummond's Rutledge Drive residence and arrested him. When he was arrested, Drummond told police "that he had nothing to do with the shooting of the baby. He was on Duncan Lane that night and heard gunshots and he walked to Rutledge to see what had happened." During the search, the police seized a drum containing 75 rounds of 7.62 × 39 mm ammunition, three boxes containing 46 rounds of 7.62 × 39 mm ammunition, a single round of 7.62 × 39 mm ammunition, an empty AK magazine, a Taurus 9 mm handgun with no barrel, a bulletproof vest, and several rounds of 9 mm, .45 caliber, and .357 caliber ammunition.

{¶ 20} During the search of Drummond's residence, police also seized an album of gang photographs of the Lincoln Knolls Crips. Drummond appears in many photographs. The album also contained a number of photographs and tributes to Brett Schroeder and other members of the gang who had been killed. One page of the album shows two photographs of Drummond with a cake that says, "RIP Brett." Another photograph shows tattoos of guns, tombstones, and other symbols on Drummond's back. The tombstone tattoo contains Schroeder's name and names of Drummond's other dead friends.

{¶ 21} Dr. Dorothy Dean, Deputy Coroner for Franklin County, conducted the autopsy of three-month-old Jiyen. Dean testified that Jiyen died from a gunshot

wound to the head. The entry wound was on the back of Jiyen's head, and the exit wound was just below the left eye.

{¶ 22} Between March and August 2003, Chauncey Walker and Drummond were incarcerated in the same cellblock at the Mahoning County jail. Drummond talked to Walker about his case almost "[e]very single day." Walker testified, "[A]s soon as he'd come out of his cell, he'd come directly to my cell * * * [and] he'd be talking to me about that case." As to what happened on March 24, Drummond told Walker that he "was sitting in his sister['s] driveway and Wayne pulled up, and * * * he asked Wayne to take him to go get a gun somewhere. * * * So Wayne gave him a ride to go get the gun. * * * [W]hen Wayne backed up in the driveway after he * * * got the gun, the dude, Jiyen, supposed to have stayed * * * a couple houses up from his sister or right around the corner, * * * [and] he said he got out the car and fired some shots at the house and then he got back in the car and pulled off." Drummond told Walker that "he intended to hurt whoever the bullet hit," but "he didn't intend to kill no baby."

{¶ 23} Nathaniel Morris was another inmate in the same cellblock with Drummond and Walker. During May 2003, Morris overheard Drummond tell Walker that "he didn't meant [sic] to kill the baby; he was trying to get at somebody else * * *." On more than one occasion, Morris overheard Drummond asking Walker, "[Y]ou think I'm going to get convicted on this, you think they have anything on me, stuff like that."

### Defense Case

{¶ 24} Drummond called five witnesses. William Harris, an inmate at the Mahoning County jail, was incarcerated in a cell adjacent to Walker's. He said that in March 2003, Walker told Harris that "he knew how [Walker] could get outta of jail. [Walker] would have to go over and talk to the prosecutor and say that John [Drummond] admitted to his part in the case." Harris also said that Walker's cell was some distance from Drummond's cell and that Drummond and Walker "couldn't talk unless they yelled across the range." On another occasion, Harris saw Walker enter Drummond's cell after he "told the deputy he was gonna get a magazine, and he come out with [Drummond's] discovery pack [i.e., court papers]."

{¶ 25} Elisa Rodriguez, who lived next door to Drummond on Rutledge Drive, testified that on the evening of March 24, she was at home with her eight-year-old son. Rodriguez observed Gilliam's car parked in front of her house. While in her back bedroom, she heard voices, looked into the back yard, and saw Gilliam and a "tall, skinny guy." She saw them walk towards the front of her home and then heard shooting. Rodriguez and her son went to the living room, looked out the front window, and saw Gilliam standing in her neighbor's front yard shooting

a "big gun" at a house across the street. Rodriguez said that after the shooting stopped, Gilliam got into his car alone and fled the scene. Rodriguez then saw Jawany, who was a "tall, skinny black man" from the neighborhood, running down Rutledge Drive shooting a gun. She next said that she heard Jawany firing his last gunshot in front of the Dent home and saw him flee down an alleyway between two houses. Rodriguez testified that she did not see Drummond in the area when the gunshots were fired.

{¶ 26} Rodriguez's son, Jimmy Figuera, testified that on that evening, he heard gunshots while at home with his mother. He looked out the front window and saw Wayne shooting a "big" gun. He then saw "Wayne comin' down the street shootin' from Duncan." Jimmy did not see Drummond, whom he referred to as "Uncle J," when the shootings took place.

### Trial Result

{¶ 27} The jury found Drummond guilty as charged, and Drummond was sentenced to death. Drummond now appeals to this court as a matter of right.

### Pretrial and Trial Issues

{¶ 28} Pursuant to our order on November 4, 2005, the parties submitted supplemental briefs on the issue of whether Drummond was deprived of his Sixth Amendment right to a public trial.

### Facts of Public–Trial Issue

{¶ 29} Following a luncheon recess on February 4, 2004, the trial court announced:

{¶ 30} "Ladies and gentlemen that are here to watch the trial, the Court is going to clear the courtroom for the remainder of the afternoon. You are invited back tomorrow morning at 9 o'clock in the morning. Okay? Deputies, clear the courtroom. And leave the building, not only to leave the courtroom but leave the building."

{¶ 31} Afterwards, the trial court explained why it cleared the courtroom:

{¶ 32} "The Court: It's come to the attention of the Court that some of the jurors—or witnesses feel threatened by some of the spectators in the court. The Court's making a decision that until we get through the next couple of witnesses I'm going to clear the courtroom. That includes the victim's family, the defendant's family and all other spectators. The Court had two incidents yesterday involving one of the spectators where he showed total disrespect to the Court in chambers and gave the deputies a very hard time. I didn't hold him in contempt of court, but just after that then another individual—there was a physical

altercation between that individual who also came to watch the trial. His name's Damian Williams. * * *

{¶ 33} " * * *

{¶ 34} "The Court: Who ultimately got charged with assault on a peace officer. So over the objection of the defendant I'm clearing the courtroom just for today only. Mr. Gentile?

{¶ 35} "[Defense Counsel] Mr. Gentile: * * * We would object to the Court's ruling. The defendant is entitled to a public trial under the United States Constitution. I don't disagree that there has been some sort of misconduct here that has been brought to my attention. However, that has not been attributable to the defendant, to Mr. Drummond, and we, therefore, don't think that he should be punished in terms of not having the support, people—his family, that in the nature of this case, a capital case, that he would require making.

{¶ 36} "The Court: Just to perfect the record, I do believe that the one individual who was not charged with contempt of court yesterday, Michael Peace, is in fact John Drummond's brother.

{¶ 37} "[Prosecuting Attorney] Mr. Franken: No.

{¶ 38} "The Court: No?

{¶ 39} "Mr. Franken: Michael Peace says he's family. Others have said he isn't. He told Deputy Schmuck that he was family to Drummond. He's not a brother though.

{¶ 40} "The Court: Right. And we go back to when we were seating the jury and John Drummond approached a potential juror's husband in the jail, so. There's been a string of things.

{¶ 41} " * * *

{¶ 42} "The Court: * * * We would all agree that the media is permitted in so at least we have a record by a disinterested outside source."

{¶ 43} In an entry dated February 5, the trial court stated, "Due to the behavior of some of the Courtroom spectators and the fear of retaliation expressed by various witnesses, the Court, upon motion of the State, ordered all spectators removed from the Court for the duration of February 4, 2004 beginning at 1:30 p.m. This over the objection of the Defendant. The media will be permitted access."

{¶ 44} The cross-examination of James "Cricket" Rozenblad and the testimony of two other prosecution witnesses, Nathaniel Morris and Yaraldean Thomas, occurred while the courtroom was closed.

{¶ 45} Before Leonard Schroeder's testimony the next day, the trial court announced:

{¶ 46} "The Court: * * * We're going to continue on with the testimony. And at this time I'm going to clear the courtroom until another witness is called. So for the people that are spectators in the courtroom, you may remain in the courthouse but you probably will not be permitted back in till about quarter till 3:00 or so."

{¶ 47} In an entry that day, the trial court stated, "Due to the safety concerns expressed by witness Leonard Schroeder Jr., the Court ordered the Courtroom closed (February 5, 2004) to all except the media during his testimony only. This without objection from either party."

{¶ 48} Schroeder then testified while the courtroom was partially closed. The spectators were allowed to return to the courtroom following his testimony, and the trial resumed without any further closure.

## Discussion of Public–Trial Issue

{¶ 49} The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution. See *State v. Lane* (1979), 60 Ohio St.2d 112, 119, 14 O.O.3d 342, 397 N.E.2d 1338. This guarantee is a "cornerstone of our democracy which should not be circumvented unless there are extreme overriding circumstances." Id.

{¶ 50} The violation of the right to a public trial is considered structural error and not subject to harmless-error analysis. *Waller v. Georgia* (1984), 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31, fn. 9; *Johnson v. United States* (1997), 520 U.S. 461, 468–469, 117 S.Ct. 1544, 137 L.Ed.2d 718. A structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante* (1991), 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302.

{¶ 51} The right to a public trial is not absolute, and in some instances must yield to other interests, such as those essential to the administration of justice. A trial judge has authority to exercise control over the proceedings and the discretion to impose control over the proceedings. Nonetheless, the abridgement of a defendant's right to a public trial may occur only when necessary, and any closure must be narrowly drawn and applied sparingly. See *State ex rel. The Repository, Div. of Thompson Newspapers, Inc. v. Unger* (1986), 28 Ohio St.3d 418, 421, 28 OBR 472, 504 N.E.2d 37; *Lane*, 60 Ohio St.2d at 121, 14 O.O.3d 342, 397 N.E.2d 1338; *State v. Clifford* (1999), 135 Ohio App.3d 207, 213, 733 N.E.2d 621.

{¶ 52} In *Waller*, in the context of a suppression hearing, the United States Supreme Court set forth the following four-pronged test that courts must use to determine whether closure of a courtroom is necessary: "the party seeking to

close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Waller*, 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31.

{¶ 53} *Waller* dealt with the suppression hearing during which·all persons other than witnesses, court personnel, the parties, and their lawyers were excluded for the entire duration. Id. at 42, 104 S.Ct. 2210, 81 L.Ed.2d 31. This case differs, as it deals with partial closure of a trial. The trial court excluded members of the public and the defendant's family, but did so only for the length of a single cross-examination and two other witnesses' testimony. The trial court permitted media representatives to remain in the courtroom throughout the testimony of these witnesses. Federal courts have concluded that when a trial judge orders a partial, as opposed to a total, closure of a court proceeding, a "substantial reason" rather than *Waller*'s "overriding interest" will justify the closure. See *Woods v. Kuhlmann* (C.A.2, 1992), 977 F.2d 74, 76; *United States v. Sherlock* (C.A.9, 1989), 962 F.2d 1349, 1357; *Nieto v. Sullivan* (C.A.10, 1989), 879 F.2d 743, 753; *Douglas v. Wainwright* (C.A.11, 1984), 739 F.2d 531, 533.

{¶ 54} The trial court's closure order on February 4, 2004, satisfied the *Waller* criteria. First, the trial court's interest in maintaining courtroom security and protecting witness safety supported the trial court's limited closure of the courtroom. There had been a physical altercation between a spectator and courtroom deputies, and a second incident occurred in the judge's chambers. The trial court also stated that "the fear of retaliation expressed by various witnesses" was a basis for its action. In this regard, we acknowledge the dangerous nature of gang violence and the genuine need to protect witnesses testifying against gang members from the deadly threat of retaliation. Cf. *Brown v. Kuhlmann* (C.A.2, 1998), 142 F.3d 529, 537–538 (concern for undercover officer's safety in testifying against drug dealers justified partial closure where closure was brief and testimony given during the closure was merely corroborative). Thus, the trial court had a "substantial reason" to order the partial closure of the courtroom.

{¶ 55} Second, the closure was no broader than necessary. The courtroom was closed only while Rozenblad was cross-examined and while Morris and Thomas testified. Spectators were readmitted afterwards. Also, the trial judge provided expressly that the media could remain in the courtroom during the testimony of all these witnesses. The media presence helped safeguard Drummond's right to a public trial. Indeed, the witnesses' awareness of the media minimizes the risk that they would alter their testimony when the proceeding was partially closed. Moreover, the transcript of the trial became a public record. In sum, we find

none of the secrecy prohibited by the Sixth Amendment. See *United States v. Sherlock*, 962 F.2d at 1358.

{¶ 56} Drummond contends that the closure was overly broad because his family was excluded from the courtroom along with the general public during the testimony of these three witnesses. The Supreme Court has noted a special concern for allowing a defendant's family members to attend a trial. See *In re Oliver* (1948), 333 U.S. 257, 272, 68 S.Ct. 499, 92 L.Ed. 682 ("an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged"); see, also, *Vidal v. Williams* (C.A.2, 1994), 31 F.3d 67, 69. Although we do not condone the removal of family members from the courtroom, in this case, we hold that the trial court's decision in excluding them for a limited time, after considering the defendant's rights and the need to protect witnesses, did not violate Drummond's right to a public trial. See *Sherlock*, 962 F.2d at 1357.

{¶ 57} With respect to the third *Waller* factor, the record does not show that the trial court considered alternatives to closure. However, the partial closure of the courtroom only during the cross-examination of Rozenblad and the testimony of Morris and Thomas is narrower than full closure for the entire trial. See *Brown*, 142 F.3d at 538.

{¶ 58} As to the final *Waller* factor of adequate findings, the trial court stated that there had been a physical altercation between spectators and courtroom deputies. The trial court also mentioned that another incident had occurred in the judge's chambers and that witnesses had expressed fear of retaliation by testifying in open court. The trial court also identified Damian Williams and Michael Peace as involved in the earlier disturbances. Although the trial court should have made additional findings to clarify the reasons for closing the court, the strength of the judge's actual findings must be evaluated in reference to the limited scope of the closure. By that standard, we conclude that the trial court's findings were adequate. See *Brown*, 142 F.3d at 538; *Woods*, 977 F.2d at 77–78 (the fourth *Waller* factor was satisfied, despite the lack of specific findings of fact, where the "information gleaned" from the record was "sufficient to support the partial, temporary closure of petitioner's trial"). There was a "substantial reason" for the partial closure, partial closure of the courtroom was narrowly drawn and limited in scope, and the trial court made sufficient findings in support of its order. Under these circumstances, where there is an interest in maintaining courtroom order and security, the trial court did not abuse its discretion in ordering the limited closure of the courtroom. Accordingly, we hold that the trial court did not violate Drummond's constitutional right to a public trial by closing the trial on the afternoon of February 4, 2004.

{¶ 59} Regarding closure on February 5, 2004, the defense did not object to the trial court's action. Defense counsel were present during the entire proceedings and were fully aware of the exclusion of the spectators from the courtroom. Thus, counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial during Schroeder's testimony. See *Peretz v. United States* (1991), 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808, citing *Levine v. United States* (1960), 362 U.S. 610, 619, 80 S.Ct. 1038, 4 L.Ed.2d 989.

{¶ 60} Based on the foregoing, we conclude that Drummond's Sixth Amendment right to a public trial was not violated by the partial closure of his trial on February 4 and February 5, 2004.

{¶ 61} *Jury view.* In proposition of law VII, Drummond argues that the trial court abused its discretion in permitting opening statements prior to a jury view. He also argues that the jury view was conducted improperly because the jurors were separated into groups when viewing the crime scene.

{¶ 62} R.C. 2945.16 provides, "When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court." Furthermore, the "trial court is vested with a broad discretion in such matters, and its judgment will not be disturbed absent an abuse of discretion." *State v. Zuern* (1987), 32 Ohio St.3d 56, 58, 512 N.E.2d 585.

{¶ 63} In this case, the parties agreed that opening statements would be made before the jury view. Thus, Drummond invited any error that occurred and cannot complain. *State v. Seiber* (1990), 56 Ohio St.3d 4, 17, 564 N.E.2d 408; *State v. Murphy* (2001), 91 Ohio St.3d 516, 535, 747 N.E.2d 765. Moreover, trial counsel objected to neither the prosecutor's references to the jury view during his opening statement nor the separation of the jurors into groups at the scene. Thus, Drummond waived all but plain error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus.

{¶ 64} We find no plain error. R.C. 2945.16 does not prohibit jury views after opening statements have been presented. The trial court properly exercised its discretion by allowing opening statements before the jury view because the parties agreed to do so. See *State v. Watson* (1991), 61 Ohio St.3d 1, 10–11, 572 N.E.2d 97 (no abuse of discretion by allowing the jury to view the scene a second time, *after* it had already begun deliberations).

{¶ 65} Drummond has also not demonstrated how the presentation of opening statements before the jury view prejudiced him. The trial court instructed the jury that opening statements were not evidence, but a "concise and orderly description of each side's claim and defense and the evidence they expect to be produced in support of those claims and defenses." Similarly, the trial court

advised the jurors that the "only purpose of [the jury view] is to help [them] understand the evidence as it is presented in the courtroom."

{¶ 66} No plain error occurred when the jurors were divided into groups during the jury view. Before leaving for the jury view, the trial court advised the jurors: "Because of the conditions and the size of the home, probably only four to six jurors will leave the bus at one time. So you'll be told accordingly to go in and look around. You may not ask any questions. Bernice will be pointing things out to you that the attorneys have asked her to do."

{¶ 67} Drummond interprets the R.C. 2945.16 phrase that the "the trial court may order them to be conducted in a body" to require that the jurors not be separated at the crime scene. However, separate viewing was the only means of getting all the jurors inside the Dent home to view the crime scene. Drummond does not claim that the separate groups were shown different parts of the house or given briefings once inside. Thus, Drummond has failed to demonstrate error. Cf. *State v. Collins* (Jan. 5, 2001), Greene App. No. 2000 CA 8, 2001 WL 9924, *3 (two separate vehicles taking jurors to jury view did not result in prejudicial error).

{¶ 68} Based on the foregoing, we reject proposition VII.

{¶ 69} *"Other acts" evidence.* In proposition of law I, Drummond argues that the trial court erred by admitting evidence of his gang-related activity. Drummond also argues that the trial court erred by admitting ammunition and a bulletproof vest seized from his residence that were not clearly linked to the offenses charged.

{¶ 70} **1. Gang-related evidence.** During a search of Drummond's bedroom, the police seized a photo album of Drummond's gang-related activity with the Lincoln Knolls Crips. Album photos and other loose photos in the book showed Drummond making gang-related hand gestures. The pictures revealed gang-related tattoos on his back. Drummond's tattoos included a tombstone with the name of deceased gang members, including Brett Schroeder. The photo album also contained obituary notices and tributes to deceased gang members, including Brett Schroeder.

{¶ 71} Detective Sergeant Michael Lambert, a Youngstown police gang-unit detective, described the photo album as a "gang book" and testified what the police learned from such materials. Over defense objection, the trial court admitted the photo album.

{¶ 72} Other prosecution witnesses discussed Drummond's gang-related activities as a member of the Lincoln Knolls Crips. William and Wanda Greer live near the location of the shooting. Wanda testified that Drummond and other members of the Lincoln Knolls Crips would hang around their street. William

testified that the outline of a tombstone with the initials RIP was carved on a tree in front of their home as a tribute to "Brett." The defense, however, failed to object to this testimony and waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 73} Rozenblad testified over defense objection that Drummond and Brett Schroeder were members of the Lincoln Knolls Crips. The defense did not object to the testimony of Yaraldean Thomas, who also identified Drummond and Schroeder as members of the Lincoln Knolls Crips and stated that they considered themselves "OGs." The failure to object to Thomas's testimony waives all but plain error. Id.

{¶ 74} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character in order to show criminal propensity. "It may, however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Furthermore, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 75} The state's theory of this case was that Drummond, a member of the Lincoln Knolls Crips, fired shots into the Dent home to retaliate for the murder of Schroeder, a fellow gang member. Evidence relating to Drummond's and Schroeder's gang involvement therefore was admissible to prove Drummond's motive for firing shots into the Dent home. See *United States v. Santiago* (C.A.9, 1995), 46 F.3d 885, 889; *State v. Lewis* (Dec. 26, 1991), Cuyahoga App. No. 59465, 1991 WL 281001, *6. Drummond's tattoo with Schroeder's name inside a tombstone, the tombstone carved on the tree in Schroeder's memory, and Drummond's photo album with obituary notices and tributes to Schroeder were relevant to prove motive.

{¶ 76} Drummond's photo album and testimony from other witnesses provided evidence of the Lincoln Knolls Crips culture, symbols, hand gestures, and traditions. This evidence provided the context, motive, and set-up of the crime and was admissible "to make the actions of the participants understandable to the jurors." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 113; see, also, *State v. Robb* (2000), 88 Ohio St.3d 59, 69, 723 N.E.2d 1019. Background information about the Lincoln Knolls Crips showed the jury how the belief that Dent was somehow responsible for Schroeder's death explained why Drummond shot into the home of a person he had never met. *United States v. Mills* (C.A.11, 1983), 704 F.2d 1553, 1559; *State v. Carillo* (Oct. 13, 2000), Clark App. No. 00CA0025, 2000 WL 1513912, *3.

{¶ 77} Drummond argues that gang testimony was not admissible because Dent testified during cross-examination that he did not know Schroeder or

Drummond and did not know why shots would be fired at his house. Other testimony, however, indicated that retaliation for Schroeder's murder motivated Drummond to fire shots into the Dent home. Rozenblad testified that he had overheard Drummond and Gilliam talking about "a guy moving in in [their] neighborhood [who] could have had something to do with the death of Brett Schroeder." Thomas heard `Drummond say "It's on" after Drummond and Gilliam had finished their discussion. Finally, within a few minutes after this discussion, Drummond drove to Rutledge Drive and fired shots into the Dent home.

{¶ 78} Drummond also argues that the trial court erred by failing to give cautionary instructions on the photo album and the other gang-related testimony until final instructions. However, " 'the trial judge need not at that early stage completely instruct the jury.' " *State v. Stallings* (2000), 89 Ohio St.3d 280, 285, 731 N.E.2d 159, quoting *State v. Mason* (1998), 82 Ohio St.3d 144, 164, 694 N.E.2d 932. During final instructions, the trial court did instruct the jury:

{¶ 79} "During the course of the trial, evidence was received about the commission of other acts other than the offenses with which the defendant is charged in this trial. That evidence was received only for a limited purpose. It was not received, and you may not consider it to prove the character of the defendant in order that it show that he acted in conformity or in accordance with the character.

{¶ 80} "If you find the evidence of the other acts is true and that the defendant committed it, you may consider that evidence only for the purpose of deciding whether it proves the absence of mistake or the defendant's intent or purpose to commit the offense charged in this trial."

{¶ 81} In light of these instructions and the probative value of the photo album and the other gang-related testimony, we hold that the trial court committed no plain error in admitting the gang-related testimony of the Greers and Thomas. Nor did the trial court abuse its discretion in permitting Rozenblad's testimony and admitting the photo album.

{¶ 82} **2. Admissibility of Drummond's ammunition and bulletproof vest.** During a search of Drummond's residence, the police seized a drum containing 75 rounds of 7.62 × 39 mm ammunition, three boxes containing 46 rounds of 7.62 × 39 mm ammunition, a single round of 7.62 × 39 mm ammunition, and an empty AK magazine. Police also seized a Taurus 9 mm handgun with no barrel, a bulletproof vest, and several rounds of 9 mm, .45 caliber, and .357 caliber ammunition. Drummond argues that this evidence was not relevant because the state failed to link this ammunition to the shell casings found near the crime scene.

{¶ 83} The admission of Drummond's ammunition rested upon a question of relevance. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. See *Sage,* 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 84} The trial court did not abuse its discretion in admitting the ammunition and the 9 mm handgun seized from Drummond's residence. Drummond's possession of numerous rounds of ammunition shortly after the murder tended to prove that he had timely access to the means to commit the murder. In addition, Drummond's possession of 7.62 × 39 mm rounds of ammunition tended to prove that he had access to a weapon of the type used to kill Jiyen. See *State v. Hartman* (2001), 93 Ohio St.3d 274, 281, 754 N.E.2d 1150 (defendant's set of knives admissible as showing his easy access to a possible murder weapon and his familiarity with using knives). Further, Drummond's possession of a 9 mm handgun and 9 mm ammunition was relevant because a 9 mm weapon was fired at the Dent home on the evening of March 24. The bulletproof vest was of questionable relevance, but its admission did not result in prejudicial error in view of other evidence establishing Drummond's guilt.

{¶ 85} Based on the foregoing, we reject proposition I.

{¶ 86} *Impeachment.* In proposition of law II, Drummond claims that the trial court erred by refusing to permit his counsel to cross-examine Rozenblad, Morris, and Thomas about criminal charges pending against each of them.

{¶ 87} **Rozenblad.** Trial counsel moved to cross-examine Rozenblad about pending drug charges to show his potential bias. The prosecutor then informed the court that "[t]here's an open case" and that Rozenblad had not been indicted. The trial court ruled that Rozenblad could not be cross-examined "about pending charges in municipal court."

{¶ 88} During a later defense proffer, Rozenblad testified that he had been charged with trafficking in marijuana and had waived a preliminary hearing. Rozenblad also stated that he had not made any deals with the state in exchange for his testimony and did not expect to receive a benefit on his charges if he testified against Drummond.

{¶ 89} **Morris.** Trial counsel sought to cross-examine Morris about pending charges for the offense of escape to show "his bias or motive [for] pleasing the state." According to a defense proffer, Morris pleaded guilty to charges of cocaine possession. Morris was then "put in a work release program and walked away from that place. He was then charged with escape." When Morris was

stopped for traffic charges in Mahoning County, he was "booked * * * into the county jail on the drug cases and on the escape charge."

{¶ 90} During the hearing, trial counsel provided the court with additional information about the disposition of the escape charge:

{¶ 91} "Mr. Gentile: * * * He was * * * charged with escape.

{¶ 92} "The Court: But never convicted?

{¶ 93} "Mr. Gentile: Was not convicted. When he came back—

{¶ 94} "The Court: —to Columbus—

{¶ 95} "Mr. Gentile: —it was dismissed."

{¶ 96} The trial court ruled that the defense could not cross-examine Morris about the escape because "there's no conviction."

{¶ 97} **Thomas.** Trial counsel moved to cross-examine Thomas on pending drug charges to show his potential bias. Charges were pending against Thomas for a 1992 offense for possession of cocaine. The prosecutor informed the court that the charges "will be dismissed eventually" because the case is old, and the evidence may no longer exist to support prosecution. The prosecutor also stated that no deals about the disposition of the drug charges had been made with Thomas. However, the trial counsel averred that three joint motions to continue the case had been filed. The trial court ruled that the defense could not question Thomas about the 1992 drug charges.

{¶ 98} During a defense proffer, Michael Rich, Thomas's attorney, stated that Thomas was indicted on drug charges in 1992, but was never served with the indictment and never appeared for his arraignment. In 2003, Thomas was arrested when he was questioned about gang activity and the state discovered that he was wanted on the 1992 drug charges. Rich stated that the prosecutor indicated to him indirectly that "based on the length of the case, how old the case was, lack of evidence, that [Thomas's] case would get dismissed." However, Rich thought that the state "wanted to keep some control over" Thomas until he testified.

{¶ 99} Drummond first argues that the trial court's rulings prohibiting cross-examination of Rozenblad, Morris, and Thomas on their pending charges violated Evid.R. 608(B).

{¶ 100} Evid.R. 608(B) provides, "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of a crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if *clearly probative of truthfulness or untruthfulness,* be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness * * *." (Emphasis added.) The decision to admit evidence of

earlier misconduct of a witness for impeachment under Evid.R. 608(B) is "within the sound discretion of the trial court." *State v. Boggs* (1992), 63 Ohio St.3d 418, 424, 588 N.E.2d 813.

{¶ 101} The trial court did not abuse its discretion under Evid.R. 608(B) by rejecting cross-examination of the three witnesses about their pending charges. Rozenblad's marijuana trafficking and Thomas's cocaine possession were not "clearly probative" of their character for truthfulness or untruthfulness. See *State v. Norwood* (Mar. 22, 2002), Lake App. No. 2000–L–146, 2002 WL 445839, *3 (cross-examination as to general drug use not clearly probative of truthfulness); see, also, Giannelli & Snyder, Evidence (2d Ed.2001) 447, Section 608.5.

{¶ 102} Similarly, Morris's escape from a work-release program was not "clearly probative of his character for truthfulness or untruthfulness." *Hamm v. State* (1990), 301 Ark. 154, 158, 782 S.W.2d 577 ("An escape is not probative of truthfulness or untruthfulness * * * under * * * Rule 608(b)"); cf. *State v. Greer* (1988), 39 Ohio St.3d 236, 243, 530 N.E.2d 382 ("a violation of parole constitutes a specific instance of failure to keep his word * * * [and] is almost always 'probative of truthfulness or untruthfulness' ").

{¶ 103} Second, Drummond argues that the trial court's ruling prohibiting cross-examination on the pending charges of the three witnesses violated Evid.R. 616(A), which provides: "Bias, prejudice, interest, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by extrinsic evidence."

{¶ 104} The pendency of charges in another case or the witness's plea arrangement with the prosecutor is admissible to prove the bias of the witness. *State v. Brooks* (1996), 75 Ohio St.3d 148, 152, 661 N.E.2d 1030; *State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912, paragraph five of the syllabus (predates evidentiary rules); see 1 McCormick, Evidence (5th Ed.1999) 147, Section 39 (bias includes evidence that "an indictment is pending against [the witness], the witness has not been charged with a crime, has been promised leniency, * * * [or] is awaiting sentence"); see, also, Giannelli & Snyder, Evidence (2d Ed.2001) 562, Section 616.3. In *Hector*, we recognized, "[T]he testimony of [a prosecution] witness is or may be influenced by the expectation or hope that, by aiding in the conviction of the defendant, he might be * * * rewarded by leniency in the disposition of his own case." 19 Ohio St.2d at 178, 48 O.O.2d 199, 249 N.E.2d 912.

{¶ 105} The trial court did not abuse its discretion by not permitting the defense to cross-examine Thomas about his pending drug charges. *State v. Webb* (Dec. 8, 1999), Summit App. No. 19318, 1999 WL 1215163, *1 (the trial court exercises broad discretion in the admission and exclusion of evidence under Evid.R. 616). The defense had been informed before Drummond's trial that the

charges against Thomas would eventually be dismissed because of the age of the charges and the lack of evidence. There was no evidence that Thomas was offered a plea bargain or any other inducement to testify. Thus, the pending drug charges were not relevant in proving his bias in testifying against Drummond. See *State v. Gavin* (1977), 51 Ohio App.2d 49, 54, 5 O.O.3d 168, 365 N.E.2d 1263 ("a stale charge is irrelevant to credibility because the element of pressure is not there").

{¶ 106} The trial court also did not abuse its discretion by not allowing the defense to cross-examine Morris about the escape charge because those charges had already been dismissed. Thus, cross-examination about the dismissed charges would not have shown bias.

{¶ 107} The trial court should have permitted the defense to cross-examine Rozenblad about his pending charges, however. Rozenblad had been charged with trafficking in marijuana, and an indictment was pending on the charges. Rozenblad said that no deals had been reached in exchange for his testimony and that he did not expect to receive a benefit on the charges if he testified against Drummond. Nevertheless, if the defense had been permitted the opportunity to question Rozenblad about the pending charges, the jury could have tested his credibility. See *State v. Durant*, 159 Ohio App.3d 208, 2004-Ohio-6224, 823 N.E.2d 506, ¶ 34 ("Prejudice ensues from *a denial of the opportunity* to place the witness in his proper setting and put the weight of his testimony and his credibility to a test * * *" [Emphasis sic]).

{¶ 108} Nonetheless, we hold that any error in denying cross-examination of Rozenblad was harmless. The trial court allowed counsel to fully cross-examine Rozenblad about all aspects of his activities on the night of the murders. Rozenblad admitted that over a period of five hours on March 24, he had taken six Valium and had drunk six beers. He acknowledged during cross-examination that he did not get along with Drummond, although he had been friends with Brett Schroeder. Thus, the jury knew that Rozenblad's perceptions on the night of the murder were affected by his drug and alcohol use. The jury also knew of motivations that might have influenced his testimony. See *Brooks*, 75 Ohio St.3d at 152, 661 N.E.2d 1030 (Evid.R. 616 violation resulted in harmless error where other concrete examples of the witness's truthfulness, or lack thereof, and motivations that might have influenced his testimony were presented to the jury).

{¶ 109} Based on the foregoing, we overrule proposition II.

{¶ 110} *Evidentiary and procedural issues.* In proposition of law V, Drummond argues that the trial court erred by admitting expert testimony on gangs and evidence of gang activity. He also argues that the trial court erred by refusing to grant a mistrial after the state improperly elicited a prejudicial comment from a witness.

{¶ 111} **1. Expert testimony on gang-related activities.** Detective Sergeant Michael Lambert testified that Drummond and Brett Schroeder were members of the Lincoln Knolls Crips. He also described the photo album found during the search of Drummond's residence as a "gang book" because it included "pictures and any other significant events that affected the gang." Lambert identified photos in the album of Drummond, Schroeder, and other gang members. He described a photo showing tattoos on Drummond's back as showing "tombstones, guns, graffiti type stuff." Lambert also described gang-related hand signals that Drummond was making in some of the photos. Finally, he stated that Drummond and Schroeder were called original gangsters because they were original members of the gang.

{¶ 112} Drummond asserts that expert testimony on gangs was irrelevant. We disagree. Gang affiliation can be relevant in cases in which the interrelationship between people is a central issue. *United States v. Thomas* (C.A.7, 1996), 86 F.3d 647, 652; *United States v. Sloan* (C.A.10, 1995), 65 F.3d 149, 151. As we discussed in proposition I, evidence relating to Drummond's and Schroeder's gang involvement was admissible to prove Drummond's motive for firing shots into the Dent home. The evidence of the Lincoln Knolls Crips culture, symbols, hand gestures, and traditions provided the jury with crucial background information in considering the evidence. See *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 113.

{¶ 113} Drummond also argues that Lambert was not qualified as an expert witness and should not have been allowed to testify about gang-related activity. Under Evid.R. 702(B), an expert may be qualified by reason of his or her specialized knowledge, skill, experience, training, or education to give an opinion that will assist the jury in understanding the evidence and determining a fact at issue. Neither special education nor certification is necessary to confer expert status upon a witness. The individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function. *State v. Baston* (1999), 85 Ohio St.3d 418, 423, 709 N.E.2d 128.

{¶ 114} Pursuant to Evid.R 104(A), the trial court determines whether an individual qualifies as an expert, and that determination will be overturned only for an abuse of discretion. *State v. Williams* (1983), 4 Ohio St.3d 53, 58, 4 OBR 144, 446 N.E.2d 444.

{¶ 115} While the state never formally tendered Lambert as an expert, defense counsel never challenged his qualifications to testify and thus waived all but plain error. Crim.R. 52(B); *Hartman*, 93 Ohio St.3d at 286, 754 N.E.2d 1150. Here, there was no plain error.

{¶ 116} Lambert had worked in the gang unit for the Youngstown Police Department since 1999 and at the time of his testimony was in charge of the unit. Lambert gained his knowledge and experience about Youngstown gangs through investigating gang activities in the Youngstown area. Lambert's testimony showed that he possessed specialized knowledge about gang symbols, cultures, and traditions beyond that of the trier of fact. See *State v. Jefferson* (Mar. 21, 2001), Summit App. No. 20156, 2001 WL 276343, *5; *State v. Lewis* (Apr. 4, 1997), Greene App. No. 96 CA 12, 1997 WL 156596, *6–7. Thus, Lambert was qualified to testify as an expert about gang-related matters.

{¶ 117} Finally, relying on *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, Drummond claims that the trial court erred by failing to conduct a hearing on the reliability of Lambert's testimony. However, Drummond never challenged the relevance and reliability of Lambert's testimony and waived all but plain error. Crim.R. 52(B); *State v. Biros* (1997), 78 Ohio St.3d 426, 452, 678 N.E.2d 891.

{¶ 118} In *Daubert,* the United States Supreme Court held that under Fed. R.Evid. 702, the trial judge has a special obligation to ensure that scientific testimony is not only relevant but reliable. *Daubert,* 509 U.S. at 589–590, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469. In *Kumho Tire Co., Ltd. v. Carmichael* (1999), 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238, the United States Supreme Court extended this gate-keeping obligation to include all expert testimony—i.e., testimony based on technical and other specialized knowledge. The court added that in assessing reliability, the trial court may, at its discretion, consider the *Daubert* factors to the extent relevant. Id. at 148, 119 S.Ct. 1167, 143 L.Ed.2d 238.

{¶ 119} Without a defense objection, the trial court was not required to conduct a hearing to determine the relevance and reliability of Lambert's testimony on gangs. In a similar case involving testimony by a police gang expert, the Ninth Circuit Court of Appeals held that the *Daubert* factors (peer review, publication, potential error rate, etc.) do not apply to this kind of testimony. The court recognized that unlike scientific testimony, expert testimony about gangs depends heavily on the expert's knowledge and experience rather than on the expert's methodology and theory. *United States v. Hankey* (C.A.9, 2000), 203 F.3d 1160, 1169.

{¶ 120} Nothing in Lambert's testimony about gangs raises any reliability question. His testimony was based on his knowledge and experience with the Lincoln Knolls Crips and its members. Thus, the trial court committed no plain error by admitting Lambert's testimony.

{¶ 121} **2. Gang-related evidence.** Drummond renews his argument that the trial court erred by admitting evidence of his gang-related activity. However, as

we discussed in proposition I, the trial court committed neither plain error nor prejudicial error in admitting gang-related evidence against Drummond.

{¶ 122} **3. Questioning of Dent.** Drummond argues that the trial court erred by failing to grant a mistrial after the state asked a highly prejudicial question of Dent, the victim's father. During redirect examination of Dent, the prosecutor asked:

{¶ 123} "Q: Mr. Gentile asked you a lot of questions. Do you think any of those questions that you were asked gives anyone permission to kill your son?

{¶ 124} "A: No.

{¶ 125} "Mr. Gentile: Objection, your Honor.

{¶ 126} "The Court: Sustained.

{¶ 127} " * * *

{¶ 128} "The Court: The jurors are instructed to disregard the last question and answer."

{¶ 129} The defense counsel's motion for a mistrial because of the prosecutor's question was overruled. The trial court also instructed the jurors to disregard stricken evidence "as though [they] never heard" it during final jury instructions.

{¶ 130} The trial court did not err by refusing to grant a mistrial. While the prosecutor's question was improper, the trial court sustained the defense objection and immediately instructed the jury to disregard the testimony. Thus, the trial court's actions cured the effect of improper testimony. *State v. Heinish* (1990), 50 Ohio St.3d 231, 241, 553 N.E.2d 1026 ("Where a jury is cautioned and a correction is given to the jury, the effect of improper evidence may be cured").

{¶ 131} Moreover, "[m]istrials are necessary 'only when the ends of justice so require and a fair trial is no longer possible.'" *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 105, quoting *State v. Garner* (1995), 74 Ohio St.3d 49, 59, 656 N.E.2d 623. Here, Dent's isolated comment did not deny Drummond a fair trial.

{¶ 132} Accordingly, we reject proposition V.

{¶ 133} *Due process claims.* In proposition of law VI, Drummond argues that he was denied due process and a fair trial because the trial court (1) failed to record all sidebar discussions, (2) permitted the state to ask witnesses leading questions during direct examination, (3) allowed Detective Lambert to provide hearsay testimony, and (4) improperly admitted a 911 tape.

{¶ 134} **1. Unrecorded sidebar discussions.** The record, including voir dire and both phases of the trial, reflects more than 130 unrecorded sidebar discussions. Drummond failed to object or ask that these sidebar discussions be recorded and thereby waived the issue. *State v. Leonard*, 104 Ohio St.3d 54,

2004-Ohio-6235, 818 N.E.2d 229, ¶ 182; *State v. Nields* (2001), 93 Ohio St.3d 6, 26, 752 N.E.2d 859.

{¶ 135} "The requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus. We will not reverse because of unrecorded proceedings when the defendant failed to object and fails to demonstrate material prejudice. Id. at 554, 687 N.E.2d 685.

{¶ 136} Nothing in the record substantiates Drummond's speculation that the unrecorded sidebar discussions dealt with substantial and important legal issues. Drummond has not shown, nor does the record reveal, that these conferences concerned matters vital to appellate review. See *Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 184; *Palmer,* 80 Ohio St.3d at 554, 687 N.E.2d 685 ("prejudice will not be presumed from the mere existence of * * * unrecorded bench and chambers conferences in capital cases"). Based on the foregoing, we reject this claim.

{¶ 137} **2. Leading questions.** Drummond complains that the trial court erred by permitting the prosecutor to ask leading questions of Rozenblad, Morris, and Walker on direct examination, but cites no specific instance where improper leading questions were asked. Except where noted, defense counsel did not object to leading questions asked of the three witnesses and thus waived all but plain error. See *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 190, 616 N.E.2d 909.

{¶ 138} A leading question is "one that suggests to the witness the answer desired by the examiner." 1 McCormick, Evidence (5th Ed.1999) 19, Section 6. Under Evid.R. 611(C), "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony." However, the trial court has discretion to allow leading questions on direct examination. *D'Ambrosio,* 67 Ohio St.3d at 190, 616 N.E.2d 909.

{¶ 139} On direct examination, the prosecutor asked Morris the following questions about the date he first entered the Mahoning County jail:

{¶ 140} "Q: Do you remember when that was?

{¶ 141} "A: No.

{¶ 142} "Q: Could it have been in May of 2003?

{¶ 143} "[Defense Counsel] Mr. Gentile: Objection.

{¶ 144} "The Court: I'll note your objection.

{¶ 145} "A: Okay. Yes.

{¶ 146} "The Court: Overruled.

{¶ 147} " * * *

{¶ 148} "Q: Was it May when you overheard the conversations between Mr. Drummond and Mr. Walker?

{¶ 149} "A: Yes, sir.

{¶ 150} "Mr. Gentile: Objection.

{¶ 151} "The Court: I'll note it. Overruled."

{¶ 152} The first question merely directed Morris's attention to the date that he had first entered the Mahoning County jail, which Morris had trouble remembering during earlier testimony. The prosecutor's leading questions about the date oriented the witness to the time and moved the trial forward without unnecessary delay. The trial court did not abuse its discretion by permitting the question.

{¶ 153} The prosecutor's question whether it was May when Morris overheard the conversations was inappropriate. However, during subsequent cross-examination, Morris pinpointed May 6, 2003, as the exact date that he overheard Drummond and Walker discussing the murder. This answer showed that Morris's earlier response was not provided simply because of his susceptibility to the prosecutor's suggestion about the date. Thus, no prejudicial error resulted.

{¶ 154} Additionally, the prosecutor asked Morris leading questions after Morris experienced some difficulty in testifying:

{¶ 155} "Q: You're in a disciplinary pod?

{¶ 156} "A: Right. Right. Basically, yes, sir.

{¶ 157} "Q: Now the jury not having your experience, can you explain to them what a pod is?

{¶ 158} "A: A pod is, is where a lot of peoples is at.

{¶ 159} "Mr. Franken: May I help him?

{¶ 160} "The Court: Yes."

{¶ 161} The prosecutor then asked leading questions to assist Morris in describing the layout of the jail and in explaining why, where, and how long he had been in jail. Here, there was no plain error because these leading questions helped to develop the witness's testimony, and the answers concerned matters easily proved by other testimony. See *State v. Smith* (1997), 80 Ohio St.3d 89, 110–111, 684 N.E.2d 668 (no abuse of discretion in permitting leading questions on direct where the witness appeared nervous, "a little slow," and "straining" with his answers).

{¶ 162} During Walker's direct examination, the prosecutor addressed what Drummond told Walker about the shooting:

{¶ 163} "Q: Now, did he talk about killing a baby?

{¶ 164} "Mr. Gentile: Objection.

{¶ 165} "The Court: Note your objection. Overruled.

{¶ 166} "A: He said he didn't intend to kill no baby.

{¶ 167} " * * *

{¶ 168} "Q: Does that mean he told you he intended to kill anybody but the baby?

{¶ 169} "Mr. Yarwood: Objection.

{¶ 170} "Mr. Gentile: Objection.

{¶ 171} "The Court: I'll note to the form of the question. Sustained. Put another question.

{¶ 172} "Q: Okay. Did he say that he intended to kill?

{¶ 173} "A: He intended to kill whoever the bullet hit but not directly towards the baby."

{¶ 174} The prosecutor's question about whether Drummond talked about "killing a baby" directed the witness's attention to the subject of inquiry and was proper. However, the question whether Drummond "told [Walker] he intended to kill anybody but the baby" was improperly leading. Nevertheless, the trial court sustained the objection, and no prejudicial error resulted.

{¶ 175} As for Rozenblad, no improper leading questions were asked.

{¶ 176} **3. Hearsay.** Drummond claims that the trial court erred by permitting Detective Lambert to identify members of the Lincoln Knolls Crips. Counsel failed to object to that testimony and waived all but plain error. *Childs,* 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. There was no plain error.

{¶ 177} Lambert described photographs, obituary notices, and other material found in the photo album seized from Drummond's residence. During his testimony, Lambert identified two newspaper tributes to Brett Schroeder and identified the names of the individuals making the tribute from their nicknames:

{¶ 178} "Q: Would you tell the jury at the bottom of each one whose names are there?

{¶ 179} "A: On the first one it says Love, Michael, Leonard, Jay, JP, Damien, Dre, and all your homies.

{¶ 180} "Q: Now, do you know who those people are?

{¶ 181} "A: Some of them.

{¶ 182} "Q: Which ones do you know?

{¶ 183} "A: I believe Leonard would be Leonard Schroeder, Jay would be John Drummond, Damien would be Damien Williams, Dre would most likely be Andre Bryant, and I'm not sure about JP.

{¶ 184} "Q: Michael, do you know who Michael is?

{¶ 185} "A: Could be John Drummond's brother, Michael Brooks."

{¶ 186} As we discussed in proposition V, Detective Lambert properly provided expert testimony on gang activities of the Lincoln Knolls Crips. His identification of the individuals was based upon his personal knowledge and experience in investigating and dealing with the gang and its members. Lambert's testimony was not based upon mere hearsay and speculation. See *State v. Jones* (June 13, 2000), Franklin App. No. 99AP–704, 2000 WL 756843, *6. Thus, we hold that Lambert's testimony did not result in plain error.

{¶ 187} **4. The 911 tape.** Finally, Drummond asserts that the prosecutor failed to authenticate and establish the chain of custody before the 911 tape of Dent's call to the police was played in court. As the defense failed to object to the 911 tape at trial, all but plain error was waived. See *State v. Kinley* (1995), 72 Ohio St.3d 491, 497, 651 N.E.2d 419.

{¶ 188} The 911 tape recorded Dent's call to the police reporting that Jiyen had been shot. Drummond makes no claim that there was any problem with the authenticity or the chain of custody of the 911 tape. The 911 tape was played during Dent's testimony when Dent identified his own voice and Butler's voice on the tape. Under these circumstances, no plain error resulted from admitting the 911 tape.

{¶ 189} Based on the foregoing, we overrule proposition VI.

{¶ 190} *Manifest weight and sufficiency of the evidence.* In proposition of law XIV, Drummond challenges both the manifest weight and sufficiency of the evidence to convict him of aggravated murder and the aggravating circumstances.

{¶ 191} Although both are raised in one proposition of law, a challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence.

{¶ 192} A claim of insufficient evidence invokes a due process concern and raises the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 193} A claim that a jury verdict is against the manifest weight of the evidence involves a separate and distinct test that is much broader. " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 194} Drummond's sufficiency claims lack merit. Drummond's admissions to two cellmates, testimony from people who saw Drummond on the night of the murder, expert forensic testimony, and evidence seized from Drummond's residence were sufficient to establish his guilt. The facts showed that on the evening of March 24, 2003, Drummond and Gilliam attended a party in the neighborhood into which Dent and his family had just moved. Drummond, a member of the Lincoln Knolls Crips, Gilliam, and Bryant were overheard stating that the new neighbor might have had something to do with Schroeder's death. Drummond was then overheard saying "It's on" after they finished talking.

{¶ 195} Witnesses at the party saw Drummond leave the party and return with an assault rifle. Drummond and Gilliam then left the party in Gilliam's car and drove toward the Dent home. Approximately five to 15 minutes later, ten shots were fired into the Dent home, and Jiyen was killed. A neighbor then observed Gilliam's car, with no headlights on, pull out of a driveway near the Dent home and drive down the street.

{¶ 196} Police found ten 7.62 × 39 mm shell casings from an assault rifle a short distance from the Dent home. Forensic examiners determined that the shots were fired into the Dent home from the spot where the shell casings were found. During a later search of the Drummond residence, police seized a number of rounds of 7.62 × 39 mm ammunition and a photo album depicting Drummond's gang-related activities and postmortem tributes to Schroeder. Drummond admitted to Walker, a fellow jail inmate, that he had fired shots into the Dent residence, although "he didn't intend to kill no baby." Morris, another inmate, also overheard Drummond state that "he didn't meant [sic] to kill the baby; he was trying to get at somebody else."

{¶ 197} Nevertheless, Drummond argues that this evidence is insufficient to convict him. First, he asserts that the evidence fails to establish that he fired a weapon on the night of the murder. However, several witnesses saw Drummond with an assault rifle then. He and Gilliam were also seen driving toward the Dent home just before the shots were fired. Drummond himself admitted to

Walker that he had fired the shots into the Dent home that night, and Morris overheard his admissions to Walker.

{¶ 198} Drummond emphasizes Elisa Rodriguez's testimony that she saw Gilliam firing a weapon towards the Dent home but did not see Drummond in the area when the shots were fired. Rodriguez said that she then saw Gilliam get into his car alone and flee the scene. She also said that she saw Jawany running down Rutledge Drive, shooting a gun and saw him fire his last gunshot in front of the Dent home. Rodriguez's testimony, however, is contradicted by testimony that Drummond and Gilliam went to Schroeder's home after the shooting and by evidence that six 9 mm shots were fired towards the Dent home from the corner of Rutledge Drive and Duncan Lane. No evidence was presented that a person running down the street fired additional shots towards the Dent home.

{¶ 199} Second, Drummond argues that the person shooting the 9 mm weapon might have killed Jiyen because no evidence was presented proving the caliber of the bullet that killed him. However, expert testimony established that only one 9 mm bullet hit the Dent home, and this slug was recovered from the kitchen wall inside the house. The baby was in the living room, not the kitchen, when the shots were fired. Thus, Jiyen was not killed by a 9 mm bullet, but by a shot fired from the assault rifle into the Dent home.

{¶ 200} Third, Drummond claims that Walker's testimony was unreliable because, in exchange for his testimony, Walker received a two-year reduction on a kidnapping charge and was released from jail on a recognizance bond. Drummond argues that Morris's testimony should also be disregarded because it completely depended on Walker's credibility. This contention, however, calls for an evaluation of Walker's credibility, which is not proper on review of evidentiary sufficiency. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79.

{¶ 201} Finally, Drummond argues that the evidence was insufficient because there were discrepancies in witness testimony on the timeline of events and Rozenblad and Thomas were under the influence of drugs and alcohol when they witnessed anything. Drummond also claims that Rozenblad had no independent memory of these events when he testified and that Thomas's testimony was unreliable because he never told police what he testified to in court and his testimony contradicted what he said at Gilliam's trial.

{¶ 202} Despite some discrepancies, the jury accepted the testimony of the state's witnesses. Furthermore, a review of the entire record shows that the testimony was neither inherently unreliable nor unbelievable. Therefore, witness testimony, circumstantial and forensic evidence, and Drummond's own statements provided sufficient evidence to prove beyond a reasonable doubt that Drummond was guilty of aggravated murder and the aggravating circumstances.

{¶ 203} With respect to Drummond's manifest-weight challenges, this is not an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717. The jury neither lost its way nor created a miscarriage of justice in convicting Drummond of the aggravated murder charges and the accompanying aggravating circumstances.

{¶ 204} Based on the foregoing, we reject proposition XIV.

### Ineffective Assistance of Counsel

{¶ 205} In proposition of law IV, Drummond argues that he received ineffective assistance of counsel. Reversal of a conviction for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

### A. Pretrial Allegations

{¶ 206} **1. Failure to request bail.** Drummond argues that his counsel were ineffective by not requesting bond at arraignment. However, Drummond was an indigent defendant, and he does not establish how he would have been able to post bond. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 152, 749 N.E.2d 226. Moreover, during arraignment, the trial court noted that Drummond was pending sentencing on a separate cocaine charge, and the state had just filed a motion to have bond revoked on those charges. Further, following conviction, "any error concerning the issue of pretrial bail is moot." *State v. Patterson* (1996), 110 Ohio App.3d 264, 271, 673 N.E.2d 1001

{¶ 207} Thus, counsel were not ineffective by failing to request bond.

{¶ 208} **2. Failure to file a motion to suppress.** Drummond claims that his counsel were ineffective by failing to file a motion to suppress evidence seized as the result of an unconstitutional search. Drummond fails to indicate where this search took place. Assuming that he is referring to the search of his residence, we note that the police obtained a search warrant beforehand. Drummond also presents no evidence of an illegal search. "Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion." *State v. Gibson* (1980), 69 Ohio App.2d 91, 95, 23 O.O.3d 130, 430 N.E.2d 954. Further, " 'failure to file a suppression motion does not constitute per se ineffective assistance of counsel.' " *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, quoting *Kimmelman v. Morrison*

(1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. Thus, we find that this claim also lacks merit.

{¶ 209} **3. Co-counsel's belated appointment.** Drummond asserts that his lead trial counsel was ineffective because his co-counsel had only 32 days to prepare for trial. The trial court allowed Gary Van Brocklin, Drummond's co-counsel, to withdraw from the case because of a conflict of interest. James Gentile, Drummond's lead counsel, remained on the case. The trial court appointed Ronald Yarwood as replacement co-counsel.

{¶ 210} Drummond does not explain how Yarwood's later appointment prejudiced his defense. Before being appointed co-counsel, Yarwood informed the court that he believed he had adequate time to prepare for the case. In addition, review of the record shows no evidence that Drummond was prejudiced by Yarwood's appointment. See *State v. Reynolds* (1998), 80 Ohio St.3d 670, 674, 687 N.E.2d 1358 (lead counsel's appointment to represent a capital defendant two weeks before the start of trial did not result in ineffective assistance). Accordingly, this claim also lacks merit.

{¶ 211} **4. Delay in hiring a private investigator.** Drummond claims that his counsel were ineffective because they did not request funds to hire a private investigator until six months after the indictment. Again, Drummond fails to specify how counsel's failure to hire a private investigator at an earlier date prejudiced him. He does not claim that his investigator did not adequately investigate facts or interview witnesses in his case. Because Drummond has failed to demonstrate that he was prejudiced, we reject this claim.

{¶ 212} **5. Waiver of oral argument.** Drummond argues that his counsel were ineffective by waiving oral argument on his motion to dismiss the death specifications. However, trial counsel filed a lengthy brief challenging the death specifications. Given the "strong presumption" under *Strickland* that counsel's performance constituted reasonable assistance, counsel's decision to waive oral argument was a "tactical decision." See *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, Drummond fails to show that a "reasonable probability" exists that but for counsel's waiver of oral argument, the trial court's ruling would have been different. See *Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373. Thus, we also reject this claim.

{¶ 213} **6. Failure to challenge witnesses.** Drummond asserts that his counsel were ineffective by failing to challenge Walker and Morris from testifying about his jailhouse confession. Drummond does not provide any basis for a defense challenge of these witnesses. Because their testimony was properly admitted, counsel were not deficient by failing to challenge them. See *Hartman,* 93 Ohio St.3d at 298, 754 N.E.2d 1150; *State v. Taylor* (1997), 78 Ohio St.3d 15, 31, 676 N.E.2d 82 ("Counsel need not raise meritless issues * * * ").

{¶ 214} **7. Failure to take an active approach.** Drummond claims that his counsel's comment that they were "not looking to explore the state's case" and counsel's admission that his "confidence was a little shaken" showed that his counsel took a "laissez-faire" approach to his case. Drummond's complaint takes these remarks out of context. First, counsel's remarks that they were "not looking to explore the state's case" were made during argument requesting a bill of particulars. Counsel's remarks were not deficient because this argument was successful, and the state provided the defense with a bill of particulars. Second, counsel's comment that his "confidence was a little shaken" responded to Drummond's complaint to the Mahoning County Bar Association about counsel's representation. Counsel's remarks reflected no unwillingness to continue actively defending his client. The record shows that counsel vigorously represented Drummond throughout the trial. In sum, Drummond fails to demonstrate how counsel's two isolated comments resulted in deficient performance or were prejudicial.

## B. Guilt–Phase Allegations

{¶ 215} **1. Failure to object to instructions.** Drummond argues that his counsel were ineffective by failing to object to the trial court's instruction that "[h]e has a constitutional right not to incriminate himself" because it conveyed to the jury that Drummond would incriminate himself if he did testify. But this instruction was followed by the admonition, "If he does not testify, that fact must not be considered by you for any purpose whatsoever." We hold that the trial court's instruction was proper and overrule this claim. See *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 26.

{¶ 216} Drummond also claims that his counsel were ineffective by failing to object to instructions that "should the panel of 12 jurors plus four alternates determine the State did prove beyond a reasonable doubt Count 1 or Count 2, we will * * * reconvene to determine the potential penalty." During the same set of instructions, the trial court explained that an alternate juror would take part in the jury's deliberations only if the alternate replaced one of the regular jurors. Thus, none of the regular or alternate jurors were misled about their role at trial. Thus, we also reject this claim.

{¶ 217} **2. Questioning of prospective jurors.** Drummond asserts that his counsel were ineffective by failing to object when the trial court informed prospective jurors that "a chronic alcoholic or drug dependent person" could be challenged for cause. According to Drummond, the trial court's "blunt approach" in asking about possible alcohol or drug dependence diminished the likelihood that a prospective juror having such a problem would admit it. However, Drummond fails to demonstrate that any of the prospective jurors failed to disclose drug or alcohol dependency. The trial court properly listed the reasons

for a challenge for cause. See Crim.R. 24(C). The trial court also informed the prospective jurors that if any of them had a reason for being challenged, they should remain in the courtroom after the other jurors departed to discuss it with the lawyers and the judge. This procedure helped to eliminate any reluctance that a prospective juror might have in disclosing alcohol or drug dependency. Thus, Drummond has failed to show that counsel's failure to object was deficient or prejudicial, and this claim is overruled.

{¶ 218} **3. Failure to review and object to gang-related evidence.** Drummond argues that his counsel did not properly identify and analyze gang-related evidence and did not obtain photographs relating to gang activity before trial. The record belies these claims. As the result of reviewing gang-related evidence before trial, counsel filed a motion in limine objecting to photographs of gang-related activities contained in the photo album seized from Drummond's residence.

{¶ 219} Drummond also argues that counsel were ineffective by failing to request cautionary instructions on gang-related testimony. As we discussed in proposition I, the trial court did provide such cautionary instructions. We also reject Drummond's claim that counsel were ineffective by failing to object to Detective Lambert's hearsay testimony. As we discussed in proposition V, Lambert's expert testimony about gangs was admissible. Drummond was not prejudiced by his counsel's failure to make continuing objections to evidence concerning gang activity or the state's use of "gang affiliation" during opening statement, direct testimony, and closing argument.

{¶ 220} **4. Failure to object to unrecorded sidebars.** Drummond claims that his counsel were ineffective by failing to object to unrecorded sidebar conferences. As we discussed in proposition VI, there were more than 130 unrecorded sidebar conferences. Drummond cannot show prejudice because there is no evidence about what happened during those sidebars. *State v. Tyler* (1990), 50 Ohio St.3d 24, 38, 553 N.E.2d 576. "Acts of omissions by trial counsel which cannot be shown to have been prejudicial may not be characterized as ineffective assistance." *State v. Davie* (1997), 80 Ohio St.3d 311, 332, 686 N.E.2d 245.

{¶ 221} **5. Withdrawal of pro se motion.** Drummond contends that his counsel were ineffective by withdrawing his pro se motion to suppress evidence seized from his residence. There is no evidence, however, that the police search of his residence was improper. Drummond fails to show that counsel's withdrawal of the pro se motion was prejudicial, and therefore, we also reject this claim. See *Nields*, 93 Ohio St.3d at 34, 752 N.E.2d 859 (withdrawal of motion to suppress was not ineffective assistance of counsel when doing so was a "tactical decision, there was no reasonable probability of success, or there was no prejudice to the defendant").

{¶ 222} **6. Failure to object to police opinion.** Drummond complains that his counsel were ineffective by failing to object to Officer Brian Butler's testimony identifying "brain matter" at the crime scene. Officer Butler testified that a photograph taken at the crime scene shows "brain matter * * * leading from the living room to the hallway." Trial counsel's failure to object was not deficient because the testimony was proper. Butler's testimony was lay opinion based upon his perception of evidence at the Dent residence. See Evid.R. 701; *State v. Jells* (1990), 53 Ohio St.3d 22, 28–29, 559 N.E.2d 464 (police officer's testimony on footprint comparisons admissible as lay opinion); *State v. Stout* (1987), 42 Ohio App.3d 38, 536 N.E.2d 42, paragraph two of the syllabus (police officer may give lay opinion that a stain depicted in a photograph appears to be blood). Moreover, Drummond suffered no prejudice from Butler's testimony because other evidence clearly established that Jiyen died of a gunshot to the head.

{¶ 223} **7. Other acts of alleged ineffectiveness of counsel.** Drummond claims that his lead counsel was remiss in failing to fully investigate Walker's file but does not mention any specific instances of counsel's failure to investigate or explain how he was prejudiced. Thus, this claim lacks merit. As discussed in proposition VI, Drummond was not prejudiced by his counsel's failure to object to the playing of the 911 tape. He was also not prejudiced by counsel's failure to object to the state's leading questions.

{¶ 224} In summary, none of Drummond's claims establish ineffective assistance of counsel, and proposition IV is rejected.

### Prosecutorial Misconduct

{¶ 225} In proposition of law VIII, Drummond argues that the prosecutor committed misconduct by asking leading questions on direct, permitting hearsay testimony, introducing gang-related testimony, and barraging the jury with inflammatory and highly prejudicial evidence. However, with respect to each claim, Drummond provides no examples of the misconduct or record references showing when the misconduct occurred.

{¶ 226} The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. *State v. Smith* (1984), 14 Ohio St.3d 13, 14–15, 14 OBR 317, 470 N.E.2d 883. The touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 227} First, Drummond recasts his objections to the prosecutor's leading questions on direct examination into claims of prosecutorial misconduct. However, as discussed earlier in proposition VI, none of the leading questions asked during direct examination resulted in either prejudicial error or plain error.

{¶ 228} Second, Drummond's claim that the prosecutor committed misconduct by introducing hearsay testimony is the same issue as that relating to Detective Lambert's testimony raised in proposition VI. However, as we discussed in proposition VI, Drummond failed to object, and no plain error was committed by introducing Detective Lambert's testimony.

{¶ 229} Third, Drummond asserts that the prosecutor committed misconduct by introducing gang-related evidence. However, as we discussed in propositions I and V, no prejudicial error or plain error was committed in introducing that evidence.

{¶ 230} Finally, the record fails to disclose that the prosecutor improperly introduced inflammatory and prejudicial evidence. We also reject Drummond's claim that the cumulative effect of the prosecutor's misconduct denied him a fair trial. Drummond received a fair trial, and none of the instances of alleged prosecutorial misconduct, either individually or collectively, amounted to prosecutorial misconduct. See *State v. Smith* (2000), 87 Ohio St.3d 424, 444, 721 N.E.2d 93; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 348, 612 N.E.2d 1227.

{¶ 231} Based on the foregoing, we overrule proposition VIII.

### *Constitutionality*

{¶ 232} In proposition of law III, Drummond makes various claims that the death-penalty specifications are unconstitutional.

{¶ 233} First, Drummond asserts that the child-murder aggravating circumstance, R.C. 2929.04(A)(9), is unconstitutional because the statute fails to require that an accused knew that the victim was under 13 years of age at the time of the offense. Drummond argues that the absence of such a requirement makes the statute void for vagueness.

{¶ 234} R.C. 2929.04(A)(9) provides that the imposition of the death penalty for aggravated murder may be imposed if "[t]he offender, in the commission of the offense, purposefully caused the death of another who was under thirteen years of age at the time of the commission of the offense, and either the offender was the principal offender * * * or, if not the principal offender, committed the offense with prior calculation and design."

{¶ 235} R.C. 2929.04(A)(9) is not unconstitutionally vague. The statute is very clear that the murder of a child under the age of 13 makes the killer eligible for the death penalty. This statutory language is easily understood, unlike other statutes that the Supreme Court has found vague. See, e.g., *Maynard v. Cartwright* (1988), 486 U.S. 356, 363–364, 108 S.Ct. 1853, 100 L.Ed.2d 372 (holding "especially heinous, atrocious, or cruel" to be vague). Moreover, the General Assembly's desire to protect child victims independent of the offenders' knowledge or intent that a victim is a young child is rationally based on the need

to protect young children from violence. Thus, the fact that the state is not required to prove that Drummond knew that the victim was under the age of 13 does not make the statute void for vagueness.

{¶ 236} Further, the constitutionality of similar statutory provisions not requiring a culpable mental state as to the age of the victim has been upheld in other jurisdictions. See *State v. Colon* (2004), 272 Conn. 106, 380–381, 864 A.2d 666; *Black v. State* (Tex.Crim.App.2000), 26 S.W.3d 895, 897–899; see, also, *Stevens v. State* (Ind.1997), 691 N.E.2d 412, 431–432. Thus, Drummond's challenge is overruled.

{¶ 237} Second, Drummond argues that the R.C. 2929.04(A)(9) specification fails to narrow the class of offenders eligible for the death penalty. However, we reject this claim. See *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 73–76.

{¶ 238} Third, Drummond contends that the R.C. 2929.04(A)(9) specification is unconstitutional because it alleges that Drummond was either "the principal offender in the commission of the offense or, if not the principal offender, committed the offense with prior calculation and design." However, no alternative theories under R.C. 2929.04 were presented to the jury because the guilt-phase and penalty-phase instructions referred only to "principal offender" and not to prior calculation and design. Thus, we also reject this contention.

{¶ 239} Finally, we summarily reject Drummond's claim that the course-of-conduct specification is unconstitutionally vague. See *State v. Benner* (1988), 40 Ohio St.3d 301, 305, 533 N.E.2d 701. Accord *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 715 N.E.2d 1144.

{¶ 240} Based on the foregoing, proposition III is overruled.

{¶ 241} In propositions of law XII and XIII, Drummond challenges the constitutionality of Ohio's death-penalty statutes. However, we summarily reject such claims. See *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 734 N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 242} We also reject Drummond's argument that Ohio's death-penalty statutes violate international law and treaties to which the United States is a party. *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484; *State v. Phillips* (1995), 74 Ohio St.3d 72, 103–104, 656 N.E.2d 643.

### *Proportionality*

{¶ 243} In propositions of law IX, X, and XI, Drummond disputes the constitutionality of Ohio's proportionality review. We also find that these claims lack merit. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166,

¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

## INDEPENDENT SENTENCE EVALUATION

{¶ 244} Having considered Drummond's propositions of law, we now independently review Drummond's death sentence for appropriateness and proportionality, as R.C. 2929.05(A) requires us to do. The evidence at trial established beyond a reasonable doubt that Drummond was properly convicted of a course of conduct in killing or attempting to kill two or more people, R.C. 2929.04(A)(5), and murder of a child under 13 years of age, R.C. 2929.04(A)(9), in Counts One and Two. Before submitting the case to the jury during the penalty phase, the trial court merged Count Two with Count One.

{¶ 245} Against these aggravating circumstances, we now weigh the mitigating factors contained in R.C. 2929.04(B). Drummond called five mitigation witnesses and made an unsworn statement for the jury's consideration.

{¶ 246} Cynthia Drummond, the defendant's mother, testified that Drummond has two brothers, two sisters, and a stepsister. Drummond's mother was divorced from his father when Drummond was 14 years old. Drummond then lived with his father in the family home. However, he did not do well in school and received failing grades. Later, Drummond moved in with his brother.

{¶ 247} When Drummond was 16 years old, he was shot five times, and his injuries resulted in the amputation of his leg. Drummond and his mother then returned to the family home. Drummond went through rehabilitation and received a prosthetic leg. He never finished school. Drummond's mother suspected that Drummond and his friends were involved in gang activity, but he denied it. In 2001, Drummond was shot in his other leg. Drummond is also a father of twins. According to his mother, he "loves his kids" and interacts well with them.

{¶ 248} John Drummond Sr., the defendant's father, testified that Drummond moved into his home following the loss of his leg. During the past two or three years, father and son have "gotten closer, sort of seeing things on the same lines." His father has also noticed a positive change in Drummond since the birth of his twins, a boy and a girl. The father testified that in interacting with his children, Drummond shows patience and understanding and tries to deal with the children on their level. Drummond's father testified that he loves his son and sees a lot of good in him. Drummond has made some wrong choices, but his father believes that he can communicate his experiences to others and educate them.

{¶ 249} Shalise DeMarco is the mother of Drummond's two-year-old twins. DeMarco and Drummond are no longer together, but they remain friends. She also states that Drummond "loves his kids."

{¶ 250} Lovely Atkins and Drummond were neighbors in the Lincoln Knolls area. They have known each other for several years, and Atkins considers Drummond a good friend. She says Drummond "was always nice. He looked out for a lot of people to make sure no harm would come" to them. Drummond would often ask Atkins how she was doing in school. He would also tell her, "[A]lways be a good girl. Never get in any mess around here. * * * [K]eep it up, and * * * make sure you do good." Atkins "looked up" to Drummond and took what he told her "to heart."

{¶ 251} Dr. John Fabian, a clinical psychologist, performed psychological testing and a clinical assessment of Drummond. Fabian found that Drummond is "significantly below average in verbal skills and vocabulary." Results from the Weschler Adult Intelligence Scale showed that Drummond has an IQ of 82. However, Fabian does not believe that Drummond is neurologically impaired, and he has no history of any serious brain trauma. Nevertheless, "overall he is below average in intellectual functioning."

{¶ 252} Drummond grew up in the Youngstown area. Although his parents were divorced in 1991, Drummond was raised in a "[p]retty intact home." Drummond's parents seemed involved in his life. His mother attended "parent-teacher conferences, and there was care and support." Moreover, Drummond was never sexually abused or seriously neglected. According to the psychologist, "there was some evidence of whippings, [and] normal spankings," but there was no family history of domestic violence or serious abuse.

{¶ 253} Drummond was involved with the Crips from ages 13 to 19. According to Fabian, Drummond "made a choice as an adolescent to run the streets, involve himself in a gang." However, it was a choice based on "peers and social environment, not his family."

{¶ 254} While involved with gangs, Drummond witnessed many shootings and experienced other violence. When Drummond was 16, he was shot, and his leg was amputated. In 2001, he was shot twice. However, Drummond claims that he is no longer in a gang.

{¶ 255} Dr. Fabian testified that Drummond was "nonchalant" about being shot. "It was not a big deal to him." In explaining Drummond's attitude, Fabian said, "It's the way he lived. It's the way his world was. It's violence. * * * It's losing friends. It's being shot at. It's shoot first, ask questions later. It's that kind of environment that needs to be explained."

50

{¶ 256} Fabian also testified that Drummond has a juvenile record but nothing too serious. He believes that Drummond can adjust well to prison because he has had no violent infractions while in jail during the past year, and is "older." During cross-examination, Fabian acknowledged that Drummond has been in a segregation unit of the jail during the past year and that when Drummond was in jail in 1999, he was involved in a fight with another inmate.

{¶ 257} During further cross-examination, Fabian said that Drummond has no history of mental illness. He also reported that Drummond has been convicted of "drug abuse, cocaine."

{¶ 258} During a brief unsworn statement, Drummond extended his "condolences to Jiyen and his girlfriend Latoya Butler * * * for the passing away of their son." Drummond also said, "I object to these charges that has been brought against me. I know that you or nobody you hang with had nothing to do with the death of Brett Schroeder. I feel very sad about the passing of Jiyen Dent, Jr. but I did not commit this crime that I have been accused of." In closing, Drummond said, "I ask the jury to have mercy for the crime that I have been accused of."

### Sentence Evaluation

{¶ 259} We find nothing in the nature and circumstances of the offense to be mitigating. On the evening of March 24, 2003, Drummond drove by the home occupied by Dent, Butler, and their three-month-old baby, Jiyen, and fired his assault rifle into the residence. One bullet killed three-month-old Jiyen. Thus, Jiyen's murder was part of a course of conduct involving the murder of a child under 13 years of age.

{¶ 260} Drummond's character offers nothing in mitigation, and his history and background also provide little in the way of mitigation. Drummond was raised in a home where both parents loved and supported him. However, Drummond dropped out of school and became involved in violent gang activity that led to the crimes in this case.

{¶ 261} The statutory mitigating factors are generally inapplicable: R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); and (B)(6) (accomplice only). Drummond does not assert the R.C. 2929.04(B)(5) mitigating factor (lack of significant criminal record), nor is there any evidence that the (B)(5) mitigating factor applies.

{¶ 262} We also conclude that the R.C. 2929.04(B)(4) mitigating factor (youth of the offender) is entitled to little, if any, weight because Drummond was 25 years of age at the time of the offenses. See *Robb*, 88 Ohio St.3d at 91, 723 N.E.2d

1019; *State v. Brewer* (1990), 48 Ohio St.3d 50, 64, 549 N.E.2d 491 (25–year–old defendant not a "youthful offender").

{¶ 263} We recognize and give weight to other mitigating factors under R.C. 2929.04(B)(7). First, the love and support that Drummond shares with his family deserve some weight in mitigation. Additionally, testimony that Drummond is a loving and supportive father to his two young children is entitled to weight. See *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 178; *State v. Fox* (1994), 69 Ohio St.3d 183, 194, 631 N.E.2d 124 (defendant's love and care of his daughter is a mitigating factor).

{¶ 264} Second, Drummond's below-average intelligence (IQ of 82) is entitled to weight in mitigation. However, there was no evidence of any significant connection between Drummond's low IQ and Jiyen's murder.

{¶ 265} We accord little weight to Dr. Fabian's opinion that Drummond may adapt well to prison life. This testimony is negated by evidence that Drummond fought with another inmate during a previous jail term.

{¶ 266} Drummond expressed "condolences" for Jiyen's death, but never acknowledged any responsibility for his death. Drummond's failure to accept responsibility for Jiyen's murder negates any mitigating weight that might otherwise exist for his recognition of the pain the Dent family suffered. See *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 178. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 267} The aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Drummond's murder of three-month-old Jiyen is a grave aggravating circumstance. So is his course of conduct in killing Jiyen and in attempting to kill Dent and Butler. In contrast, no substantial mitigation weighs against these aggravating circumstances. Thus, we hold that the death penalty is appropriate.

{¶ 268} Finally, we find that the death penalty is proportionate to death sentences approved for other child murders under R.C. 2929.04(A)(9). *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119 (12–year–old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196 (six-year-old victim); *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 79 (six-month-old victim). Furthermore, the death penalty is proportionate to death sentences approved for other course-of-conduct murders. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 203; *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 130.

{¶ 269} Accordingly, we affirm Drummond's convictions and sentences, including his sentence of death.

Judgment affirmed.

RESNICK, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

MOYER, C.J., PFEIFER and O'DONNELL, JJ., dissent.

---

**MOYER, C.J., dissenting.**

{¶ 270} I disagree with the majority's decision holding that Drummond was not denied his right to a public trial.

{¶ 271} In my view, the trial court's closure of the courtroom on February 4, 2004, resulted in structural error. See *Waller v. Georgia* (1984), 467 U.S. 39, 49–50, 104 S.Ct. 2210, 81 L.Ed.2d 31, fn. 9; *Johnson v. United States* (1997), 520 U.S. 461, 468–469, 117 S.Ct. 1544, 137 L.Ed.2d 718. "Unlike a garden-variety trial error, a structural error 'transcends the criminal process' by depriving a defendant of those 'basic protections [without which] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.'" (Citation omitted.) *United States v. Padilla* (C.A.1, 2005), 415 F.3d 211, 219, quoting *Rose v. Clark* (1986), 478 U.S. 570, 577–578, 106 S.Ct. 3101, 92 L.Ed.2d 460. The United States Supreme Court has identified structural error in a very limited class of cases, such as the complete denial of counsel, trial by a biased judge, racial discrimination in the selection of a grand jury, denial of self-representation at trial, a defective reasonable-doubt instruction, and *denial of a public trial*. *Neder v. United States* (1999), 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35; *Johnson v. United States*, 520 U.S. at 469, 117 S.Ct. 1544, 137 L.Ed.2d 718.

{¶ 272} In upholding the trial court's decision to close the courtroom on February 4, the majority places undue emphasis on the presence of representatives of the news media in the courtroom after it was closed. Moreover, the majority's application of the *Waller* four-pronged test in justifying the courtroom's closure is fatally flawed.

{¶ 273} As to the first *Waller* factor, there is little evidence that courtroom security and witness safety justified closing the courtroom on February 4. The trial court mentioned two incidents to support courtroom closure, but these had occurred *the previous day*. One incident occurred in the judge's chambers, and the second incident involved an altercation between a spectator and the deputies. In both instances, the responsible individuals were identified and sanctioned. The record also does not support closing the courtroom because of the "fear of retaliation expressed by various witnesses," because no such witnesses were

identified. Moreover, no spectators were identified who posed a threat to disturb the courtroom or intimidate any of the witnesses.

{¶ 274} As to the second *Waller* factor, the majority emphasizes that closure was no broader than necessary because the courtroom was closed only during the testimony of Thomas and Morris, and Rozenblad's cross-examination. However, Thomas, Morris, and Rozenblad were key prosecution witnesses, and their testimony was crucial in securing Drummond's conviction. Thomas saw Drummond with an assault rifle prior to the shooting and overheard Drummond tell Gilliam "It's on" before the shootings. Morris was in pretrial confinement with Drummond and overheard him tell another inmate that "he didn't meant [sic] to kill the baby; he was trying to get at somebody else * * *." Rozenblad testified on direct examination (in the presence of spectators) that he saw Drummond before the shooting talking "about a guy moving in * * * [their] neighborhood [who] could have had something to do with the death of Brett Schroeder." During cross-examination, when the courtroom was closed, Rozenblad testified that he did not get along with Drummond and that they were never friends.

{¶ 275} Additionally, Drummond's family members were not allowed to remain in the courtroom during closure. Defense counsel requested that Drummond's family members be allowed to remain in court to provide support for the defendant. Despite this request, the trial court expelled from the courtroom all spectators except for news reporters. The Supreme Court of the United States has specifically emphasized the importance of allowing members of a defendant's family to remain in court. See *In re Oliver* (1948), 333 U.S. 257, 272, 68 S.Ct. 499, 92 L.Ed. 682; see, also, *State v. Washington* (2001), 142 Ohio App.3d 268, 272, 755 N.E.2d 422 ("The state bears a heavy burden when seeking to exclude relatives of a defendant from trial"). The record provides no justification for excluding family members from the courtroom. No evidence was presented showing that any family members posed a risk of disturbing the court or threatening any of the witnesses or jurors.[1] See *State v. Clifford* (1999), 135 Ohio App.3d 207, 213–214, 733 N.E.2d 621; *State v. Sanders* (1998), 130 Ohio App.3d 92, 98, 719 N.E.2d 619 (trial court erred in expelling defendant's wife and parents because of the "dearth of evidence relating to their involvement in the disturbances").

{¶ 276} Surely, it cannot be reasonably argued that the news reporters who remained in the courtroom can stand in the shoes of members of defendant's family.

---

1. The record shows that the trial court mistakenly believed that Michael Peace, who showed disrespect to the court the previous day, was Drummond's brother. However, the prosecutor informed the court that Peace was not Drummond's brother, although Peace claimed to be "family to Drummond."

{¶ 277} In finding that closure was no broader than necessary, the majority stresses that the trial court allowed the media to remain in the courtroom. The presence of the media does not satisfy the requirements for Drummond's Sixth Amendment right to a public trial. There must still be a "substantial reason" established to permit a partial, as opposed to a total, closure of the courtroom. See *Woods v. Kuhlmann* (C.A.2, 1992), 977 F.2d 74, 76; *Nieto v. Sullivan* (C.A.10, 1989), 879 F.2d 743, 753. The record contains insufficient evidence establishing a "substantial reason" justifying the closure in this case.

{¶ 278} Third, nothing in the record shows that the trial court considered other reasonable alternatives to closing the courtroom, as *Waller* requires. Damian Williams and Michael Peace were identified by the trial court as having been involved in the disturbances the previous day. Thus, the trial court could have barred Williams and Peace from the courtroom as an alternative to closing the court to all spectators except the media. See *Sanders*, 130 Ohio App.3d at 98, 719 N.E.2d 619 (trial court erred by failing to consider alternative of identifying spectators responsible for disturbances and expelling them).

{¶ 279} The trial court also failed to discuss alternatives such as enhancing courtroom security, screening spectators allowed to remain in the courtroom, or placing a screen between the witnesses and the spectators to conceal the witnesses from public view. See *Ayala v. Speckard* (C.A.2, 1997), 131 F.3d 62, 71–72 (where the petitioners suggested "placing a screen between the witness and the courtroom spectators" as an alternative to closure). Taking these reasonable measures would have ensured courtroom security while maintaining the open courtroom that the Sixth Amendment requires.

{¶ 280} Fourth, regarding the final *Waller* factor, the trial court failed to make findings adequate to support the courtroom closure. "The requirement of specific, on-the-record findings is intended to give appellate courts a basis for determining the propriety of closure." *Bell v. Jarvis* (C.A.4, 1999), 198 F.3d 432, 441. Moreover, "the Sixth Amendment requires that consideration of these concerns be on the record and occur in the context of a case-by-case examination of the competing interests at stake." Id. at 441, citing *Waller v. Georgia*, 467 U.S. at 48, 104 S.Ct. 2210, 81 L.Ed.2d 31; see, also, *United States v. Thunder* (C.A.8, 2006), 438 F.3d 866, 868 (closure of courtroom during testimony of allegedly abused children violated defendant's Sixth Amendment right to a public trial absent findings that the closure was necessary to preserve some higher interest).

{¶ 281} Here, the record contains little information to aid a reviewing court in determining whether the trial court's order was reasonable and necessary. The trial court's judgment entry states that the prosecution moved to close the courtroom, but the record does not include the prosecution's evidence or argu-

ments supporting its position. These matters may have been considered by the court during a sidebar discussion, but no such discussions were included in the record, as *Waller* requires. See *State v. Morris,* 157 Ohio App.3d 395, 2004-Ohio-2870, 811 N.E.2d 577, ¶ 16.

{¶ 282} The majority justifies the absence of specific findings of fact because of the limited scope of the closure. However, the closure was not as limited as the majority suggests. Key prosecution testimony was presented while the courtroom was closed. Thus, the trial court erred by failing to make specific findings before closing the courtroom.

{¶ 283} I would reverse Drummond's convictions and death sentence because Drummond was denied his Sixth Amendment right to a public trial.

PFEIFER and O'DONNELL, JJ., concur in the foregoing dissenting opinion.

—————————

Paul J. Gains, Mahoning County Prosecuting Attorney, Timothy E. Franken, Chief Criminal Prosecutor, and Rhys B. Cartwright–Jones, Appellate Counsel, for appellee.

Dennis A. DiMartino, L.P.A., Dennis A DiMartino, and John P. Laczko, for appellant.